**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Lindsay Kahle,<br>Plaintiff,<br>v.<br>Lilo Enterprises Incorporated,<br>Defendant. | No. CV-24-08131-PCT-DWL<br>**ORDER** |

Plaintiff Lindsay Kahle ("Kahle") alleges that a co-worker harassed her because of her sex after their romantic relationship ended and that their employer, Lilo Enterprises Incorporated d/b/a Westside Lilo's Café ("Defendant"), failed to stop the harassment and ultimately terminated her in retaliation for her reporting of the harassment. Defendant and one of Defendant's owners, Brenda Bryant ("Bryant") (together, "Counterclaimants"), have, in turn, assert counterclaims against Kahle for defamation, false light invasion of privacy, and declaratory relief.

Now pending before the Court are the parties' motions for summary judgment. (Docs. 46, 47.) For the reasons that follow, each motion is granted in part and denied in part.

**BACKGROUND**

I. Relevant Factual Background

The following facts are derived from the parties' briefing and attached exhibits and are undisputed unless otherwise noted.

…

A. **The Café And Its Employees**

Defendant owns and operates a restaurant called Westside Lilo's Café. (Doc. 61 at 30.)[1] Defendant was co-owned by Bryant and her mother, Lilo Russell ("Russell"), until Russell passed away in January 2025. (*Id.*) In 2023, the café's employees, including Kahle, reported to and/or complied with directives from Bryant, Russell, and/or Bryant's son, Rocque Montoya ("Montoya"). (*Id.* at 67, 121, 240.)[2]

There is no formal training for the café's employees upon hiring, but Bryant shows new hires around the restaurant. (*Id.* at 35.) Bryant also tells new hires that "if they ha[ve] any problems to come to [her]." (Doc. 46-2 at 15.) The café displays various posters to comply with federal and state law, including posters about sexual harassment. (Doc. 46-8 at 10-13; Doc. 61 at 36.) The café has also displayed various posters, at different times, prohibiting cell phone use in the workplace. (Doc. 46-7 at 4-6; Doc. 61 at 36, 228, 296, 309.)[3] When Bryant disciplined employees, she did so verbally and/or through use of a form. (Doc. 46-2 at 20; Doc. 46-8 at 6 ¶ 18; *id.* at 28; Doc. 61 at 75.) Bryant kept track of some of this discipline in a notebook. (Doc. 61 at 75, 313-14.) Bryant did not issue write-ups for every incident in the workplace. (*Id.* at 51 ["There's a lot of things that I do that I don't write everything up."].) Russell gave only verbal, but never written, warnings to employees. (*Id.* at 67.)

In November 2021, Defendant hired Kahle as a part-time waitress, and she worked Sunday through Tuesday. (Doc. 46-1 at 7; Doc. 46-2 at 22; Doc. 61 at 113-14.) Other waitresses at the café included Rachel Schnelby ("Schnelby")[4] and Anne Robbins ("Robbins"). (Doc. 46-3 at 6; Doc. 46-6 at 6.)

---

[1] At various times, the parties have referred to the café as "Lilo's Westside Café." (Doc. 4 at 1; Doc. 61 at 1.)

[2] The parties appear to dispute which types of employees reported to which supervisors. (*Compare* Doc. 61 at 13 *with* Doc. 65 at 1.)

[3] Kahle does not appear to dispute the existence of the café's no-cell-phone policy; however, she disputes the extent to which that policy was enforced. (Doc. 61 at 3.)

[4] The parties inconsistently spell "Schnelby" as either "Schnelby" or "Schnebly." Because her deposition spells it as "Schnelby," the Court will use this spelling throughout this order. Quotations that use "Schnebly" have been revised throughout this order.

Defendant also employs cooks, dishwashers, other waitresses, and cashiers. (Doc. 61 at 32.) One of the dishwashers employed by Defendant was non-party Ethan Helms ("Helms"). (Doc. 46-1 at 12.) As a general matter, all daytime dishwashers worked from 8:00 a.m. to 3:00 p.m.; daytime waitresses worked from 7:00 a.m. to 2:00 p.m.; and nighttime waitresses worked from 2:00 p.m. until close. (Doc. 61 at 84.) At various times, Kahle's and Helms's schedules overlapped. (*Id.*) Dishwashers and waitresses sometimes interacted when performing various job duties. (*Id.* at 119-20.)

B. **Kahle's And Helms's Relationship**

In March 2022, Kahle began dating Helms. (Doc. 46-1 at 13.) Their relationship ended in September 2022, although they "would still hang out" and "text." (*Id.* at 13-14.)

C. **The Alleged Harassment**

Kahle claims that Helms began "harassing" her in October 2022 by calling and texting her. (*Id.* at 18-19.) Kahle did not immediately report these texts and calls to Defendant's management. (*Id.* at 21.)

On January 6, 2023, Helms messaged Kahle: "How fun do you think work is going to be if you don't unblock my cell and call me back." (Doc. 61 at 326.)

In January 2023, Kahle saw Helms arrive at the gate to her property. (Doc. 46-1 at 24-26.) Kahle did not immediately call the police or report the incident to Defendant's management. (*Id.* at 26.)

On February 14, 2023, Helms sent Kahle several messages referring to Kahle as, *inter alia*, a "dumb fucking whore" and a "dumb fucking bitch." (Doc. 61 at 328-29.) In those messages, Helms also claimed he was going to "demonstrate to [Kahle's and her husband's] kids what it looks like when dad gets skull fucked to death" and "cram [Helms's] pipe wrench up [Kahle's husband's] ass while he bleeds to death from [Helms's] dick in his eye socket." (*Id.*)[5]

Kahle claims that Helms's conduct "escalat[ed]" in "February and March" 2023.

[5] Defendant does not appear to dispute that these messages were sent; however, Defendant disputes whether it was aware of them. (Doc. 65 at 1.)

(Doc. 46-1 at 21.) Kahle also claims she had concerns about Helms's mental health. (*Id.* at 22.) Kahle further claims that Helms's "rapid" texting made it difficult for her in the workplace because she didn't "know[] if he was going to show up" and her phone would be "buzzing" while working. (*Id.* at 32.)

Kahle claims that, at one point, Helms said "[f]uck you" to her when she asked for a mop. (*Id.* at 27.) Kahle also claims that Helms once locked her out of the restaurant. (*Id.*) And Kahle claims that Helms once slammed the door on her while she was carrying a carrot cake. (*Id.*) Helms also said to Schnelby that "[Kahle] loves two guys." (*Id.* at 28.) Also, in February or March 2023, Helms stated to Kahle "[i]f I put sugar in your gas tank, whose fault is that?" (Doc. 61 at 145.)

On March 27, 2023, Helms sent Kahle several messages while she was working at the café referring to Kahle as, *inter alia*, a "whore" and "cunt." (Doc. 61 at 341-46.) At one point, Kahle responded "Pleassssse stop!!!" (*Id.* at 341.)[6]

In the week leading up to March 28, 2023, Kahle told Helms that he needed to stop the way he was communicating with her. (*Id.* at 147.) Kahle also blocked several of the numbers from which Helms was contacting her. (*Id.*)

D. **Kahle's March 28, 2023 Report**

On March 28, 2023, Kahle first reported Helms's conduct to Bryant. (Doc. 46-1 at 15.) Kahle reported to Bryant that (1) Helms had slammed the door on her while she was carrying carrot cake; (2) Helms had said "fuck you" to her when she asked for a mop; (3) "in general there was a lot of texts" from Helms; and (4) Helms had sent her a text that read: "Your truck looks really nice being driven by that faggot [referring to Kahle's husband]. I hope y'all die on the side of the road." (*Id.* at 28-29.) Kahle showed Bryant the "truck" text as well as another text in which Helms told Kahle to "die in a car accident you fat whore." (*Id.* at 36.) At her deposition, Bryant testified that Kahle told her "I've had a relationship with [Helms] and he is threatening me," and Bryant testified they were

[6] Again, Defendant does not appear to dispute that these messages were sent; however, Defendant disputes whether it was aware of them. (Doc. 65 at 1.)

"very bad threats." (Doc. 61 at 39.) At her deposition, Kahle testified that she told Bryant that Helms had made a threat to her and that she "was scared that [Helms] was escalating past words, past texts . . . ." (*Id.* at 130-31.) Kahle also testified that she told Bryant she was "scared . . . that [Helms] was taking it to that level." (*Id.* at 141.)

In response to Kahle's report, Bryant told Kahle that she would speak with Helms and "move [their] schedules around." (Doc. 46-1 at 34.) Bryant documented her conversation with Kahle. (Doc. 61 at 313-14.) Bryant also instructed Kahle to call the police if she thought she was in danger. (Doc. 46-1 at 38; Doc. 46-2 at 9; Doc. 61 at 39.)

Bryant's notes reflect that she spoke with Helms the next day and "asked him to please not call or tex[t] [Kahle] while she is working. What happens outside of the restaurant is there [sic] business." (Doc. 61 at 314. *See also id.* at 96.) Bryant also sent follow-up text messages to Helms after their conversation. (*Id.* at 55-56. *See also id.* at 363-64.) In those text messages, Bryant stated to Helms: "Please quit texting [Kahle] during work hours Please [Helms] i asked you to do this outside of the restaurant thank you." (*Id.* at 363.)

Although the parties appear to dispute whether Helms's hours were actually changed in response to Kahle's March 28, 2023 report, there does not appear to be any dispute that Kahle's hours were changed to start at 3:00 p.m. instead of 2:00 p.m. (Doc. 46-1 at 38; Doc. 46-2 at 10; Doc. 46-6 at 8.)

At some point after Bryant spoke with Helms, Helms texted Kahle to say: "Lol all [Bryant] said was she reported in I'm [sic] case you tried to sue her and she was on my side because I'm like her son." (Doc. 61 at 337.) On March 29, 2023, Kahle forwarded this text message to Bryant. (*Id.*)

E. **Kahle's April 7, 2023 Request**

On April 7, 2023, Kahle asked to have her schedule revert back to beginning at 2:00 p.m. because she couldn't afford the pay cut; Kahle was aware this change would result in her schedule overlapping with Helms's schedule at the café. (Doc. 46-1 at 42-44; Doc. 61 at 166, 338-39.) Kahle stated in a text message to Bryant that she and Helms were

overlapping at work regardless. (Doc. 61 at 338-39.)

F. **April 11, 2023 Incident And Kahle's Second Report**

On April 11, 2023, while working at the café, Helms splashed Kahle with water. (Doc. 46-1 at 49-52; Doc. 61 at 175-76, 250.) Kahle testified that after splashing her, Helms stated: "You shouldn't be back here. It's dangerous for you." (Doc. 61 at 174.)[7]

Kahle reported the splashing incident to Montoya, who did not typically handle complaints from waitresses. (Doc. 46-1 at 48-49.) Montoya directed Kahle to report the incident to Bryant. (*Id.* at 53.) Montoya contacted Bryant about the incident. (*Id.* at 53-54. *See also* Doc. 46-2 at 16.)

That same day, Helms hit Kahle in the hip with a dish cart. (Doc. 46-1 at 45-46, 81-82; Doc. 61 at 250.) Kahle was not injured in that incident. (Doc. 46-1 at 46.)

That night, Kahle reported to Russell that Helms had hit her with a dish cart, splashed water on her, and flipped her off. (*Id.* at 46-47.) Kahle also reported to Russell the earlier incident in which Helms showed up at the gate of her house. (*Id.* at 71.) Kahle asked Russell to change Helms's schedule. (*Id.* at 58; Doc. 61 at 164.) Kahle claims that during that conversation, Russell said that Helms "is a kid" and that Kahle "ha[s] no business dating a kid." (Doc. 46-1 at 48.) Kahle also testified that, during this conversation, Russell told Kahle that if she wanted the extra hour back on her schedule she needed to "stay out of [Helms's] way," stating "that's on you" and "[y]ou caused this." (Doc. 61 at 166.)

On April 13, 2023, Montoya spoke with Helms about his conduct and documented the discussion. (Doc. 46-1 at 87; Doc. 61 at 322.)

Following Kahle's April 11, 2023 report, Helms's hours were changed and Kahle's and Helms's schedules did not overlap "much at all," and Kahle only saw Helms "once or twice" at work after that. (Doc. 46-1 at 59.) After April 11, 2023, Kahle did not report any other concerns related to Helms's conduct to Defendant's management. (*Id.* at 61-62.)

---

[7] Defendant does not appear to dispute that this statement was made; however, Defendant disputes whether it was reported to management. (Doc. 65 at 3.)

G. **May 11, 2023 Police Report And Helms's Arrest**

On May 11, 2023, Kahle called the police because she believed Helms had created a fake Facebook profile of her and had posted a nude photo of her. (*Id.* at 62-63; Doc. 61 at 354-59.)[8] That evening, Helms was arrested in front of the café. (Doc. 46-1 at 64; Doc. 46-2 at 24.) At the time, Bryant believed Helms had been arrested "because he was going to show a naked picture" of Kahle on Facebook. (Doc. 46-2 at 26.)

Helms stopped working for Defendant after he was arrested. (Doc. 46-2 at 23.)[9] However, Helms continued to be paid by the café while in jail (although the parties appear to dispute why). (Doc. 47 at 4; Doc. 47-2 at 103; Doc. 55 at 2.) Additionally, Helms subsequently asked for his job back and resumed working for Defendant for a period of time. (Doc. 61 at 68, 104.)[10]

H. **May 2023 Write-Ups And Verbal Warnings**

On May 3, 2023, Bryant "wrote up Alley Arnold, a female waitress, for violating [Defendant's] no-cell phone policy." (Doc. 46-8 at 7 ¶ 35; *id.* at 24.)

On May 15, 2023, Bryant "wrote up Mario Martinez, a male cook, for violating [Defendant's] no-cell phone policy." (Doc. 46-8 at 7 ¶ 36; *id.* at 26.)

On May 21, 2023, Bryant gave Kahle a verbal warning about having her cell phone in her pocket. (Doc. 46-1 at 89, 127; Doc. 46-8 at 7 ¶ 37; *id.* at 28; Doc. 61 at 189-90, 219-21, 311.) Defendant "did not demote, suspend, cut Kahle's pay, or take any other adverse action as a result of her May 21, 2023 write-up." (Doc. 46-8 at 7 ¶ 38.)

Also in May 2023, Bryant "issued Helms a verbal warning for violating [Defendant's] no-cell phone policy." (*Id.* at 7 ¶ 33.) Bryant, herself, never wrote up

---

[8] Defendant disputes whether Helms cyberstalked Kahle or released her private photos. (Doc. 65 at 3.) Per Defendant's request (*id.* at 3 n.1), the Court takes judicial notice of the court docket dismissing the charges against Helms (Doc. 65-3 at 2-3). Fed. R. Evid. 201; *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) ("We may take judicial notice of court filings and other matters of public record.").

[9] Defendant asserts that "Helms was *terminated* after the arrest" (Doc. 46 at 5, emphasis added), but the testimony cited in support of that assertion only indicates that Helms stopped working at the café at that point.

[10] The parties dispute whether Defendant asked and/or pressured Kahle to drop the charges against Helms.

Helms. (Doc. 61 at 61.)

At some point in May 2023, Russell spoke with Kahle about saying "hi" instead of "hey" to her supervisors. (*Id.* at 186-88.) Also at some point in May 2023, Montoya responded to one of Kahle's questions about a customer's pie order with "I don't give a fuck what you do." (*Id.* at 226.)

In late May 2023, Defendant hired another waitress, Chanelle James ("James"). (*Id.* at 125-26; Doc. 65-4 at 3.)[11]

On May 28, 2023, Kahle met with Russell (with Bryant present) to discuss her recent write-ups. (Doc. 46-1 at 65-68; Doc. 46-2 at 28-29, 35; Doc. 46-8 at 7-8 ¶¶ 41-47; Doc. 61 at 85, 187-88, 348.) They spoke with "raised voices." (Doc. 46-1 at 57.) When Bryant told Kahle she needed to speak with her first before texting other waitresses about a schedule change, Kahle replied "No, I don't. Nobody does that." (*Id.* at 67; Doc. 46-2 at 29.) Kahle also "scoff[ed]" at Bryant. (Doc. 46-1 at 67.) Kahle also referred to Bryant and Russell as "unprofessional." (*Id.* at 68.) Kahle told Russell and Bryant that she felt they were retaliating against her since she reported Helms. (Doc. 61 at 204.)

### I. Kahle's Termination

On May 29, 2023, Russell terminated Kahle. (Doc. 46-2 at 30; Doc. 61 at 10.) Russell told Bryant she was terminating Kahle because of the way Kahle spoke to her the night before, for "yell[ing]," and for calling Russell and Bryant "unprofessional." (Doc. 46-2 at 30.) Russell told Schnelby that Kahle was fired because Russell and Kahle had "got[ten] into a confrontation" and Russell did not like "the way [Kahle] spoke to [her]." (Doc. 46-6 at 9.)[12] Meanwhile, Bryant testified that Kahle was fired for a "track record"

---

[11] James did not work at the café at any time when both Kahle and Helms also worked there. (Doc. 65-4 at 7.)

[12] There appears to be a dispute whether the write-up that appears at Doc. 61 at 350 is documentation of Kahle's termination or the written notice that was presented to Kahle on May 28, 2023, the night before she was terminated. (*Compare* Doc. 61 at 10 *with* Doc. 65 at 4.) The write-up at Doc. 61 at 350 appears to be the second page of the write-up at Doc. 61 at 348. (Doc. 61 at 348 [showing it is "Page 1 of 2"]; *id.* at 350 [showing it is "Page 2 of 2"].) To the extent there is a dispute about whether this is a write-up or termination documentation, it is not a material dispute.

of being "rude and insubordinate," which track record spanned "from March after she had talked to me all the way to May when she was fired." (Doc. 61 at 86.)

Bryant testified that, before Kahle, she had terminated at least one cook for "the way he talked to us" and for "slam[ing] the back door in [her] face." (Doc. 61 at 65.)

After her termination, Kahle received a series of text messages from Helms in which Helms stated that he had "only heard [Bryant's] side of it," and that "[Bryant] told [Helms] [Kahle] w[as] threatening to sue the restaurant and take her to labor court which is why she fired [Kahle]." (Doc. 61 at 352.)

Kahle did not ask for her job back at any time. (Doc. 61 at 104.)

J. **Post-Termination Developments**

On May 28, 2024, Kahle sued Defendant in Yavapai County Superior Court, asserting a claim under the Arizona Employment Protection Act ("AEPA"), a Title VII claim for hostile work environment, a Title VII sex discrimination claim, and a Title VII retaliation claim. (Doc. 1 at 5-16.) After the case was removed to federal court (Doc. 1 at 1), Defendant answered the complaint and Counterclaimants asserted counterclaims. (Doc. 4.)

K. **Allegedly Defamatory Statements**

As discussed in later portions of this order, the parties' briefing has made it difficult to identify which specific statements give rise to Counterclaimants' counterclaims—never mind to determine if there are disputes of material fact, specific to each alleged statement, regarding whether the statement was actually made, to whom it was made, and/or whether any asserted fact within the statement is untrue. Given the deficiencies of the parties' briefing on this point, the Court will simply list here each of the statements that it believes Counterclaimants are alleging were made. This list is based on (1) Counterclaimants' Amended Responses to Plaintiff's First Set of Interrogatories (Doc. 47-2 at 37-44); and (2) Counterclaimants' response brief (Doc. 55).[13]

[13] The Court has not included statements in Counterclaimants' Responses to Plaintiff's First Set of Interrogatories (Doc. 47-2 at 31-35) because those were supplanted by Counterclaimant's Amended Responses (*id.* at 37-44). Accordingly, the Court does not consider Kahle's argument—which, regardless, she does not support with any citations to

1. Statements To Robbins And Schnelby

- Counterclaimants "allowed Ethan Helms to harass her," and Plaintiff "was suing because she 'heard [she] could get up to $50,000.00.'" (Doc. 47-2 at 39.)
- Bryant was "unprofessional; 'pushy'; 'mean'; didn't know how to run a business properly"; and "didn't have her ducks in a row." (*Id.* at 39; Doc. 55-5 at 4, 6-8.)
- Counterclaimants "allowed Ethan Helms to harass/victimize her and sided with Ethan Helms over her." (Doc. 47-2 at 40; Doc. 55-5 at 9.)
- "Bryant was 'sleeping with someone's son' and . . . 'had secrets she doesn't want people to know.'" (Doc. 47-2 at 40; Doc. 55-3 at 35-37; Doc. 55-7 at 5; Doc. 55 at 4.)
- Russell "was 'evil' and '[had] a dark side to her.'" (Doc. 47-2 at 41.)
- Counterclaimants "allowed their employees to be harassed." (Doc. 55 at 3; Doc. 55-1 at 22-23; Doc. 55-5 at 5; Doc. 55-6 at 3-4.)
- Bryant "was incapable of running a business." (Doc. 55 at 3; Doc. 55-5 at 8.)

2. Statements To Helms

- "Do NOT defend those evil, greedy unhinged despotic cunts to me either." (Doc. 47-2 at 41, 72.)
- "[T]hey did their fuckin mob boss shit" (*id.* at 41) and/or Bryant and Russell are "'mob boss[es]'" that "t[old] [Kahle] to drop charges" against Helms (*id.* at 74; Doc. 55 at 5; Doc. 55-3 at 24, 29-30.)
- "[Bryant] brought the torches." (Doc. 47-2 at 41, 76.)
- "Cunt face Brenda." (*Id.* at 41, 78.)
- Kahle referred to Bryant as "your [i.e., Helms's] whore adopted 'mom.'" (*Id.* at 80.)
- "[Kahle] called [Russell/Bryant] unprofessional." (*Id.* at 41, 84; Doc. 55-3 at 37.)
- "[Bryant]'s got a bag." (Doc. 47-2 at 41, 86.)
- "[Y]ou're working for unethical entitled hateful monsters." (*Id.* at 41; Doc. 55-3 at

---

the record—that "she could not have made said statements." (Doc. 47 at 5.)

65.)

- "[T]hey're very good at manipulating misfits." (Doc. 47-2 at 41, 90.)
- "[T]here [sic] fucking encouraging fuckin with me." (*Id.* at 78; Doc. 55-3 at 33-34.)
- Bryant "stepped to [Kahle]" and "challenged [her] to a physical fight." (Doc. 47-2 at 74; Doc. 55 at 6.) Bryant was "physically threatening." (Doc. 55-3 at 32.)
- Russell and Bryant "fucked [Kahle] over and terrorized [her]." (Doc. 55 at 6; Doc. 55-3 at 38-39, 65.)
- "Counterclaimants retaliated against [Kahle]." (Doc. 55 at 6; Doc. 55-3 at 23; Doc. 55-8 at 2-3.)[14]

3. <u>Statements To Dean Leone And Black Cat Bar Patrons</u>

- Bryant is "mean." (Doc 47-2 at 42.)

4. <u>Statements To Lauren Boyd</u>

- Defendant "sides with men over women" and "be careful." (*Id.*; Doc. 55-3 at 25-26.)

II. <u>Procedural History</u>

On May 28, 2024, Kahle filed the complaint in Yavapai County Superior Court. (Doc. 1 at 5-16.)

On July 2, 2024, Defendant removed the case to federal court. (*Id.* at 1.)

On July 9, 2024, Defendant answered the complaint, and Counterclaimants asserted counterclaims against Kahle. (Doc. 4.)

On December 3, 2025, Defendant filed a motion for summary judgment (Doc. 46), which is now fully briefed (Docs. 61, 65)

Also on December 3, 2025, Kahle filed a motion for summary judgment (Doc. 47), which is now fully briefed (Docs. 55, 64).[15]

---

[14] Counterclaimants also argue that "Kahle referred to Bryant as a 'whore' and 'slut' to third parties" (Doc. 55 at 6), but the deposition testimony they cite does not refer to Kahle using the term "slut," and the only reference to use of the word "whore" is part of the phrase "whore adopted mom," which is addressed above (Doc. 55-3 at 35-36).

[15] Plaintiff's request for oral argument is denied because the issues are fully briefed

## DISCUSSION

I. Legal Standard

"The court shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014). The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018). "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors*, 771 F.3d at 1125 (cleaned up).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (cleaned up). *See also Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

There is no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted). At the same time, the evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254. Thus, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably

---

and argument would not aid the decisional process. *See* LRCiv 7.2(f).

find for either the plaintiff or the defendant." *Id.* at 255.

"[W]hen parties submit cross-motions for summary judgment, [e]ach motion must be considered on its own merits," but the Court must consider all evidence submitted in support of both motions when separately reviewing the merits of each. *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (quotation marks omitted).[16] For "the party with the burden of persuasion at trial" to succeed in obtaining summary judgment, it "must establish beyond controversy every essential element" of each claim on which summary judgment is sought. *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (quotation marks omitted). The party without the burden of persuasion at trial is entitled to summary judgment where it establishes that the party with the burden of persuasion will be unable to prove at least one element of its claim in light of the undisputed facts. *Celotex Corp.*, 477 U.S. at 322-23. This distinction reflects that the burden is ultimately on the proponent of each claim to prove it. *Id.*

## II. Defendant's Motion for Summary Judgment On Kahle's Claims

### A. **Count One (AEPA)**

#### 1. The Parties' Arguments

Defendant argues that "[t]he Complaint alleges Kahle reported the following to [Defendant]: 1) sex-based discrimination, harassment, and retaliation in violation of the Arizona Civil Rights Act ('ACRA'); 2) Helms assaulted and battered her; and 3) Helms threatened her and her family's lives." (Doc. 46 at 7.) "Regarding the first issue," Defendant argues that "the AEPA explicitly states if an employee is terminated for reporting ACRA violations, the remedies available under the ACRA are her exclusive remedy," and "[b]ecause Kahle did not pursue an ACRA claim, she may not seek

---

[16] Although *Fair Housing Council* involved "cross-motions for summary judgment" in which each side sought summary judgment on the same set of claims, *id.* at 1136, the Court discerns no reason why *Fair Housing Council*'s resulting directive that "the court must review the evidence submitted in support of each cross-motion" would be inapplicable here, where each side only moved for summary judgment on the other side's affirmative claims for relief. At any rate, under Rule 56(c), the court always retains the authority to "consider other materials in the record," even those beyond those "cited" by the parties, when deciding a motion for summary judgment.

corresponding remedies under the AEPA." (*Id.*) "Regarding Helms'[s] other alleged conduct," Defendant argues that "Kahle cannot establish the first element of her AEPA claim because she testified that other than discussing the [incident where Helms showed up at her home] with Russell (she did not report why she believed it was unlawful), she never reported Helms's unlawful conduct to any managers" and so "her testimony demonstrates that she did not have a 'reasonable belief' Helms violated Arizona statutes and/or the Constitution." (*Id.* at 8.) Next, Defendant argues that "even if Kahle held such a reasonable belief, she cannot demonstrate any of managers to whom she reported Helms's conduct understood her to be reporting violations of A.R.S. §§ 13-1202, -1203, as set forth in the Complaint" because "Kahle testified that she was not physically harmed by the shoulder hit, dish cart, door shutting, and water splashing incidents she reported to Bryant, Russell, and/or Montoya." (*Id.*) Defendant also argues that "Kahle did not report to Bryant she had concerns Helms would physically harm her nor does she claim to have reported this to any other managers." (*Id.*) Defendant argues that Kahle "merely asked Bryant to not send Helms to her husband's workplace because Helms was 'real weird' on him" and her report about Helms showing up at her house "was not a protected activity because she offers no proof Russell understood Kahle to be reporting unlawful conduct—she simply assumes Russell 'understood what she meant.'" (*Id.*) Next, Defendant argues that "[e]ven if Kahle engaged in a protected activity when she called the police, she fails to establish causation" because "Bryant did not read the police report nor did she know about the charges pressed against Helms" and "Kahle confirmed she does not believe Bryant and Russell retaliated because she called the police." (*Id.* at 9.)[17] Alternatively, Defendant argues that even if Kahle has made out a prima facie case of retaliation, Defendant has articulated a "legitimate, non-retaliatory reason for its actions" because "Kahle admits to raising her voice at Bryant and Russell, calling them 'unprofessional', scoffing at them, and stating she was not required to comply with her superior's (Bryant['s]) directives."

---

[17] Kahle does not argue in her response brief that her protected activity was calling the police. (Doc. 61 at 19-20.) Instead, she argues that her protected activity was reporting Helms's conduct to Defendant's management. (*Id.* at 20.)

(*Id.*) Defendant argues that Kahle's conduct was "insubordinate and inappropriate," which is "a legitimate reason for terminating her." (*Id.*) Next, Defendant argues that Kahle cannot show its reasons for firing her were pretextual because "Russell told Bryant and Schnelby she terminated Kahle because of the way she spoke to her on May 28, 2023" and "Bryant agreed Kahle's conduct was inappropriate." (*Id.* at 9-10.)

In response, Kahle argues that "[w]hile [Defendant] is correct that the AEPA claim cannot survive to the extent it is based on a disclosure of violations of the [ACRA], both Kahle's disclosures to Bryant and Russell and the Complaint in this action indicate that Helms'[s] conduct violated Arizona law." (Doc. 61 at 19-20.) Specifically, Kahle argues that she "explained in March that she was afraid of Helms because, amount [sic] other things, he had slammed a refrigerator door on her, a violation of A.R.S. § 13-2303 [sic]. Additionally, Kahle reported to Bryant that Helms made threats against he[r] and her family in violation of A.R.S. § 13-1202. Kahle also complained about Helms'[s] assault on April 11." (*Id.* at 20.) Separately, Kahle argues in other portions of her brief that "based on what [she] reported to Bryant, Bryant received information that Helms was violating an array of Arizona laws, including harassment (A.R.S. § 13-2921 and § 13-2916), . . . stalking (A.R.S. § 13-2923), and non-consensual dissemination of intimate images (A.R.S. § 13-1425)." (*Id.* at 6.) Thus, Kahle argues that "the evidence shows that Kahle engaged in AEPA protected activity." (*Id.*) Next, Kahle argues that Defendant "incorrectly claims that its owners had to understand that what Kahle was reporting was a violation of Arizona law" but "[t]his is neither legally correct nor logical" because "the AEPA requires only that Kahle disclose adequate information to convey a statutory violation" and the "AEPA has no language suggesting than an employee educate her employers about Arizona law." (*Id.*) Next, Kahle argues that her termination "was motivated by her disclosures" because "Kahle's termination followed two months after the first report, and [Defendant's] hostility toward Kahle's complaints about Helms'[s] conduct and its increased scrutiny of Kahle leading up to her termination and circumstantial evidence of retaliatory termination violating AEPA." (*Id.*) Last, Kahle argues that Defendant's proffered reasons for

terminating her are pretextual because (1) Defendant "claims it terminated Kahle . . . because of her track record of rude and insubordinate behavior," "[y]et there is no track record until after Kahle begins to complaint about Helms"; (2) "Bryant's testimony is inconsistent as to why Kahle was terminated"; and (3) "when comparing the conduct [Defendant] alleges were the grounds for Kahle's termination with Helms['s] conduct in the workplace and towards Bryant and Russel[l], the lack of any discipline of Helms raises further credibility questions to be resolved by the jury." (*Id.* at 19-20.)

In reply, Defendant argues that Kahle's AEPA "claim fails because Kahle has not produced evidence that she reasonably believed Helms broke the law and/or that she disclosed that belief in a reasonable manner." (Doc. 65 at 13.) First, Defendant argues that "when asked if she ever told a manager that she believed Helms engaged in unlawful conduct, Kahle responded, 'No. Well, that day that I went to [Russell's] to drop the drop . . . I did tell her how he showed up at my house that day when it was muddy. That was it,'" and thus, "[b]y Kahle's own admission, she did not report conduct she reasonably believed amounted to criminal assault nor harassment." (*Id.*, citation omitted.) Second, Defendant argues that "although [Kahle] need not show she reported specific statutory violations . . . she must show she reported unlawful activity in a 'reasonable manner.'" (*Id.*) Defendant argues that Kahle "fails to demonstrate a reasonable person would understand a report that Helms slammed a door on her as reporting criminal assault" because "Kahle admits she was not injured, and she does not allege she reported she was injured." (*Id.*) Next, Defendant argues that "Kahle did not testify she told Bryant that Helms 'was threatening her and her family'" and thus "[s]he fails to demonstrate a reasonable person would understand her to be reporting a violation of A.R.S. § 13-1202, which requires proof of threats to cause a physical injury or serious property damage." (*Id.* at 14.) Next, Defendant argues that Kahle "presumably abandoned" the theory that she reported Helms standing outside her house, but that even if she didn't abandon that theory, "she fails to show a reasonable person would understand an employee reporting seeing a coworker at their gate on a single occasion four months prior as a violation of the Arizona

Constitution or statute." (*Id.*) Next, Defendant argues that "Kahle cannot rely upon temporal proximity or [Defendant's] alleged 'hostility' towards Kahle to establish causation" because "[s]he claims [Defendant] terminated her 62 days after her first alleged protected activity and 48 days after her second alleged protected activity" but "she does not dispute that the day before she was terminated, she yelled at her superiors, scoffed at them, called them unprofessional, and refused to comply with their directives" and "[e]vidence of temporal proximity is less persuasive if it also supports a defendant's independent reason for an adverse action." (*Id.* at 12, 14, citation omitted.) Finally, Defendant argues that "Kahle fails to show pretext because she offers no evidence rebutting 1) Russell and/or Bryant had a good faith belief Kahle was insubordinate/inappropriate during their May 28, 2023 interaction and 2) [Defendant] terminated her for such conduct." (*Id.* at 14.)

2. <u>Analysis</u>

Under A.R.S. § 23-1501(A)(3)(c)(ii), "[a]n employee has a claim against an employer for termination of employment" if:

> The employer has terminated the employment relationship of an employee in retaliation for . . . [t]he disclosure by the employee in a reasonable manner that the employee has information or a reasonable belief that the employer, or an employee of the employer, has violated, is violating or will violate the Constitution of Arizona or the statutes of this state to either the employer or a representative of the employer who the employee reasonably believes is in a managerial or supervisory position and has the authority to investigate the information provided by the employee and to take action to prevent further violations of the Constitution of Arizona or statutes of this state or an employee of a public body or political subdivision of this state or any agency of a public body or political subdivision.

*Id.* Thus, to prevail on a claim under this provision of the AEPA, Kahle "must establish: (1) she had information or a reasonable belief that her employer or another employee had violated an Arizona statute or constitutional provision; (2) she disclosed the information or belief to an employer or a representative of the employer whom she reasonably believed was in a managerial or supervisory position and had the authority to investigate the

information and take action to prevent further violations of the Arizona constitution or statutes; and (3) she was terminated because of the first two steps." *Denogean v. San Tan Behav. Health Servs., LLC*, 2017 WL 4922035, *3 (D. Ariz. 2017). *See also Chen v. Cozzoli LLC*, 2022 WL 845190, *3 (D. Ariz. 2022) (same).

Even if Kahle establishes a prima facie case of wrongful termination under A.R.S. § 23-1501(A)(3)(c)(ii), Defendant "may avoid liability by identifying a legitimate, non-retaliatory reason for the termination decision." *Gonzalez v. US Hum. Rts. Network*, 617 F. Supp. 3d 1072, 1083 (D. Ariz. 2022), *aff'd sub nom.*, 2026 WL 382043 (9th Cir. 2026). If Defendant "articulates such a reason, [Kahle] has the burden of showing the proffered reason is pretextual." *Id. See also Murar v. AutoNation Inc.*, 2021 WL 3912849, *4 (D. Ariz. 2021) ("The burden-shifting analysis established by the United States Supreme Court in *McDonnell Doulgas Corp. v. Green*, 411 U.S. 792 (1973), applies to AEPA retaliation claims at the summary judgment stage. Under this framework, an employee has the initial burden of establishing a prima facie case of retaliation. If the employee establishes a prima facie case, the burden shifts to the employer to articulate a legitimate nonretaliatory reason for termination. If the employer articulates such a reason, the plaintiff has the burden of showing the employer's alleged reason is pretextual.") (cleaned up).

a. **Protected Activity**

As an initial matter, Defendant argues (Doc. 46 at 7-8), and Kahle does not dispute (Doc. 61 at 19-20), that Count One cannot survive to the extent it is based on Kahle reporting alleged violations of the ACRA. The Court agrees. *See also Archer v. Partners in Recovery LLC*, 2019 WL 3253175, *3 (D. Ariz. 2019) (dismissing claim "to the extent Plaintiff asserts a separate ACRA-based AEPA claim"); *Baker v. Walgreens Ariz. Drug. Co.*, 2016 WL 3181683, *3 (D. Ariz. 2016), *aff'd*, 691 F. App'x 861 (9th Cir. 2017) ("To the extent that Plaintiff's remaining state law claim can be characterized as an alleged AEPA claim premised on ACRA violations, substantial caselaw suggests that Plaintiff's claim is not actionable.").

Putting aside ACRA, Kahle argues that she "explained in March that she was afraid

of Helms because, amount [sic] other things, he had slammed a refrigerator door on her, a violation of A.R.S. § 13-2303 [sic]. Additionally, Kahle reported to Bryant that Helms made threats against he[r] and her family in violation of A.R.S. § 13-1202. Kahle also complained about Helms'[s] assault on April 11." (Doc. 61 at 20.) Separately, Kahle argues that "based on what [she] reported to Bryant, Bryant received information that Helms was violating an array of Arizona laws, including harassment (A.R.S. § 13-2921 and § 13-2916), . . . stalking (A.R.S. § 13-2923), and non-consensual dissemination of intimate images (A.R.S. § 13-1425)." (*Id.* at 6.)

As an initial matter, Kahle must limit her arguments to the Arizona statutes she identified in her complaint. *See, e.g.*, *Pitcher v. Banner Health*, 2023 WL 2585295, *1 (D. Ariz. 2023) ("A plaintiff need not have identified the specific statute or constitutional provision to her employer at the time she reported the perceived violation. But once she elects to file a lawsuit, in order to adequately plead an AEPA claim she must be able to identify in her complaint the specific statute or constitutional provision she reasonably believed her employer violated.") (citation omitted); *Chen,* 2022 WL 845190 at *4 ("There is a split in authority on this issue. To the extent it is necessary to wade into the debate here, the Court is persuaded by the decisions concluding that an AEPA plaintiff must identify the underlying Arizona statute or constitutional provision with specificity at the pleading stage.") (citation omitted); *Foster v. Pinnacle Health Facilities XXI LP*, 2021 WL 4844102, *3 (D. Ariz. 2021) ("Many courts have concluded that a plaintiff asserting an AEPA claim must provide such an identification . . . ."). The complaint alleges that Kahle's reporting only encompassed violations of two Arizona statutes: (1) Kahle "reported that Mr. Helms was assaulting and battering her while she was on the clock working for" the café, in violation of A.R.S. § 13-1203 (assault); (2) Kahle "reported that Mr. Helms was threatening her life and her family's life while she was at work and at home," in violation of A.R.S. § 13-1202 (threatening or intimidating). (Doc. 1 at 13 ¶¶ 86-89.) Because Kahle never amended her complaint, she cannot argue, for the first time in response to a summary judgment motion, that her AEPA claim is actually based on the

reporting of alleged violations of different Arizona statutes. *Cf. Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1079-80 (9th Cir. 2008), *overruled on other grounds by Apache Stronghold v. United States*, 101 F.4th 1036 (9th Cir, 2024) ("[T]he Navajo Plaintiffs concede the specific allegations at issue were not included in their complaint. Rather, the Navajo Plaintiffs assert this NEPA claim was adequately presented to the district court because the claim was briefed at summary judgment by all parties and presented at oral argument to the district court. Nevertheless, our precedents make clear that where, as here, the complaint does not include the necessary factual allegations to state a claim, raising such claim in a summary judgment motion is insufficient to present the claim to the district court.").[18]

Turning back to A.R.S. §§ 13-1202 and -1203, Defendant argues that Kahle did not have a "reasonable belief" that Helms actually violated either statute. (Doc. 65 at 13.) Defendant cites Kahle's deposition testimony, in which she testified:

> Q. Did you ever have discussions with anyone at [the café] in a management position that you had concerns about Mr. Helms engaging in any kind of unlawful conduct?
>
> A. No. Well, the day that I went to [Russell's] to drop the drop and we had that long conversation, I did tell her how he showed up at my

[18] "[T]he rule in the Ninth Circuit is that when, as here, a plaintiff seeks to advance a new claim (which doesn't appear in the complaint) in response to a summary judgment motion, the assertion of that new claim should be treated as a request to amend the complaint." *Chaffin v. Centurion of Arizona, LLC*, 2025 WL 522518, *4 (D. Ariz. 2025) (citing *Desertrain v. Los Angeles*, 754 F.3d 1147, 1154 (9th Cir. 2014)). "Although such amendment requests are ordinarily subject to the liberal requirements of Rule 15, the more stringent standards of Rule 16(b)(4) apply if a scheduling order has issued, it includes a deadline for seeking amendment of the pleadings, and the current request comes after that deadline." *Id.* The Case Management Order ("CMO") in this case set a deadline for "amending pleadings" of October 11, 2024. (Doc. 15 at 1.) Although the parties subsequently sought and obtained several extensions of other deadlines (*see, e.g.*, Docs. 26, 27, 35, 36, 41, 42), they never sought an extension of the amendment deadline. "Thus, to the extent [Kahle's] response brief should be construed as an amendment request, its filing date of [January 22, 2026 (Doc. 61)] means it is subject to Rule 16(b)(4)'s 'good cause' requirement." *Chaffin*, 2025 WL 522518 at *5 (citation omitted). "It is [Kahle's] burden to establish such good cause." *Id.* "A court's evaluation of good cause is not coextensive with an inquiry into the propriety of the amendment under Rule 15. . . . [T]he focus of the inquiry is upon the moving party's reasons for seeking modification. If that party was not diligent, the inquiry should end." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992) (citations omitted). Such is the case here—Plaintiff was not diligent.

> house that day when it was muddy. That was it. I did say like, you know, "I could have called the cops on him for that, but I didn't. I didn't want to." I don't really remember her having much of a reaction either way. That was about it.
>
> . . .
>
> Q. Other than that discussion that took place on April 11th, 2023, did you ever report to anyone else at the café that you believed that Mr. Helms had engaged or was going to engage in unlawful conduct?
>
> A. No.

(Doc. 46-1 at 71-73.) On the one hand, this testimony seems to suggest that Kahle believes the only "unlawful conduct" she reported to management was Helms showing up to her house. On the other hand, Kahle also testified that when she spoke to Bryant on March 28, 2023, she showed Bryant a text message she received from Helms that read "Your truck looks really nice being driven by that faggot. I hope y'all die on the side of the road." (Doc. 61 at 137-38.) In that text message, Helms was stating that he had seen Kahle's husband at the dump, which is where her husband worked, driving Kahle's truck. (*Id.*) A reasonable juror could conclude that Kahle reasonably believed that Helms's text message was threatening Kahle's and her husband's life in violation of A.R.S. § 13-1202 ("A person commits threatening or intimidating if the person threatens or intimidates by word or conduct . . . [t]o cause physical injury to another person . . . .").

More important, Bryant testified that during Kahle's first report on March 28, 2023, Kahle told her "I've had a relationship with [Helms] *and he is threatening me*," and Bryant herself characterized them as "very bad *threats*." (Doc. 61 at 39, emphases added.) Bryant also testified that Kahle "told [her] that [Helms] *was threatening her* and doing all this bad stuff" and that Bryant told Kahle "that is very bad" and "[y]ou need to call the police and have him arrested." (*Id.*, emphasis added.) A reasonable juror could conclude from Bryant's testimony that Kahle reported that Helms was not just "threatening" Kahle in the colloquial sense but was threatening Kahle in violation of Arizona's threatening statute.

Moreover, Kahle testified that when she separately reported Helms's conduct to Russell on April 11, 2023, she told Russell that Helms had been sending her "these crazy

texts" and that "he says threatening things." (*Id.* at 172.) In response, Russell simply stated: "Don't show me any of the texts. I don't want anything to do with it." (*Id.*) Again, a reasonable juror could conclude that this was Kahle reporting a violation of Arizona's threatening statute.

Notwithstanding this, Defendant argues that Kahle "fails to demonstrate a reasonable person would understand her to be reporting a violation of A.R.S. § 13-1202." (Doc. 65 at 14.) This argument lacks merit. "[N]othing in § 23-1501(A)(3)(c)(ii) requires an employee to identify to an employer a specific constitutional provision or statute at the time of the disclosure. But the information an employee discloses must convey to the employer conduct that violates a state constitutional or statutory law in enough detail to alert the employer of the perceived statutory or constitutional violation." *Seballos v. Freeport-McMoRan, Inc.*, 2023 WL 5624716, *3 (Ariz. Ct. App. 2023). A reasonable juror could conclude that Kahle conveyed enough information to Bryant during their conversation on March 28, 2023, and to Russell during their April 11, 2023 meeting, to put Defendant on notice that Kahle reasonably believed Helms had violated A.R.S. § 13-1202. Indeed, Bryant testified that Kahle said Helms was "threatening" her and that she told Kahle to "call the police and have him arrested." (Doc. 61 at 39.)

Although the analysis could end there, Kahle also testified that when she spoke with Bryant on March 28, 2023, she told Bryant about Helms slamming a refrigerator door on her. (Doc. 61 at 137-38, 148.) A.R.S. § 13-1203(A) provides that "[a] person commits assault by: 1. Intentionally, knowingly or recklessly causing any physical injury to another person; or 2. Intentionally placing another person in reasonable apprehension of imminent physical injury; or 3. Knowingly touching another person with the intent to injure, insult or provoke such person." *Id.* Although Kahle testified that she was not physically harmed by this incident, she testified that she "felt physically threatened." (Doc. 61 at 144.) Kahle also testified that when she told Bryant about the door-slamming incident, she reported that she "was scared that [Helms] was escalating past words, past texts." (*Id.* at 131.) Thus, a reasonable juror could conclude that Kahle reasonably believed, and reported to Bryant,

that Helms had "[i]ntentionally plac[ed] [her] in reasonable apprehension of imminent physical injury." A.R.S. § 13-1203(A)(2).

Separately, Kahle testified that on April 11, 2023, she reported to Russell that Helms had "also hit [her] with the [dish] cart and flipped [her] off." (Doc. 46-1 at 47.) Although Kahle testified she was not "injured" in the dish-cart incident, she also testified that Helms was not joking around when this incident happened. (*Id.* at 46.) A reasonable juror could conclude that Kahle reasonably believed, and reported to Russell, that even though she was not actually injured by the dish cart, that Helms had "[k]nowingly touch[ed]" her "with the intent to injure, insult or provoke" her. A.R.S. § 13-1203(A)(3).

Kahle also testified that on the same day as the dish-cart incident, Helms splashed her with hot water. (Doc. 46-1 at 49-52.) Kahle testified that although the hot water "didn't leave, like, a burn mark," it was still "a shocking hot." (*Id.* at 52.) Kahle also testified:

Q. Did Mr. Helms ever physically harm you?

A. Just when he splashed water on me, so no.

Q. And that didn't hurt you physically?

A. *It hurt,* but it didn't leave, like, scars or anything like that, so . . . .

(*Id.* at 31, emphasis added.) Again, a reasonable juror could conclude that Kahle reasonably believed that being splashed with hot water, which "hurt" her, was assault per A.R.S. § 13-1203 and that she reported this assault to Defendant.

b. **Causation**

"Arizona courts, as well as federal courts interpreting Arizona law, have held that a plaintiff asserting an AEPA retaliation claim must show that retaliation was a substantial (even if not the sole) motivating factor in the termination. Put another way, to prove this causal link, the employee must show that the employer's retaliatory motive played a part in the employment action." *Gonzalez*, 617 F. Supp. 3d at 1084 (cleaned up).

Here, Kahle has presented evidence that she complained to her employer on March 28, 2023 and April 11, 2023 and was terminated on May 29, 2023. "Construed in the light most favorable to [Kahle], a reasonable juror could infer a causal link between [Kahle's]

reports of illegal conduct and the termination decision as a result of their temporal proximity." *Id.* *See also Murar*, 2021 WL 3912849 at *8 ("A causal link can be inferred from timing alone where an adverse employment action follows on the heels of protected activity.") (cleaned up); *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (holding that "[c]ausation sufficient to establish the third element of the prima facie case may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision," and further holding "[p]roximity in time [was] apparent" where employment decision came "less than three months" after protected activity). *Cf. Thomas v. City of Beaverton*, 379 F.3d 802, 812 (9th Cir. 2004) ("The causal link between a protected activity and the alleged retaliatory action 'can be inferred from timing alone' when there is a close proximity between the two. Here, . . . approximately seven weeks after Thomas first supported Perry's promotion, Miller informed Thomas that she was being placed on extended probation. We have held that events occurring within similar intervals of time are sufficiently proximate to support an inference of causation.") (citations omitted).

Defendant argues that "Kahle cannot rely upon temporal proximity . . . to establish causation" (Doc. 65 at 14), but the cases cited by Defendant on this point are distinguishable. In *Curley v. City of N. L.V.*, 772 F.3d 629 (9th Cir. 2014), the court found that temporal proximity, under the facts of that case, was not alone enough to establish *pretext*. *Id.* at 634. In contrast, the court reaffirmed that a plaintiff may establish *prima facie* causation by relying on temporal proximity. *Id.* ("It is true that very close temporal proximity between a protected activity and an adverse employment action can be sufficient evidence of a causal link between the two to support a prima facie showing of retaliation."). Similarly, in *Kama v. Mayorkas*, 107 F.4th 1054 (9th Cir. 2024), the court addressed whether evidence of temporal proximity alone can establish *pretext*. *Id.* at 1059-60 ("*Curley* illustrates that when temporal proximity cuts both ways—*i.e.*, an adverse action follows on the heels of *both* a protected activity *and* an independent reason for adverse

action—it might not be enough *standing alone* to establish *pretext*.") (emphases added).

c. **Legitimate, Non-Retaliatory Reason For Termination**

Defendant argues that "Kahle admits to raising her voice at Bryant and Russell, calling them 'unprofessional', scoffing at them, and stating she was not required to comply with her superior's (Bryant['s]) directives" and that "[h]er conduct [was] insubordinate and inappropriate, and [Defendant] had a legitimate reason for terminating her." (Doc. 46 at 9.) Kahle does not appear to dispute that rude and insubordinate behavior is a legitimate, non-retaliatory reason for termination. (Doc. 61 at 19.) Instead, Kahle argues that Defendant's "reasons for terminating Kahle are pretext." (*Id.* at 18-19, cleaned up.)

d. **Pretext**

"Because [Defendant] has proffered evidence that it had legitimate, nondiscriminatory reasons for the challenged termination decision, the burden shifts to [Kahle] to show the proffered reasons are pretextual." *Gonzalez*, 617 F Supp. 3d at 1087. "A plaintiff may meet the burden to show pretext using either direct or circumstantial evidence. Direct evidence is evidence which, if believed, proves the fact of discriminatory animus without inference or presumption. Direct evidence typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer. Circumstantial evidence, in contrast, is evidence that requires an additional inferential step to demonstrate discrimination. It can take two forms. First, the plaintiff can make an affirmative case that the employer is biased. For example, statistical evidence is circumstantial evidence that could, if sufficiently probative, point to bias. Second, the plaintiff can make his case negatively, by showing that the employer's proffered explanation for the adverse action is unworthy of credence." *Id.* at 1087-88 (quoting *Coghlan v. Am. Seafoods Co. LLC.*, 413 F.3d 1090, 1094-96 (9th Cir. 2005)). "The distinction between direct and circumstantial evidence is crucial, because it controls the amount of evidence that the plaintiff must present in order to defeat the employer's motion for summary judgment. Because direct evidence is so probative, the plaintiff need offer 'very little' direct evidence to raise a genuine issue of material fact. But when the plaintiff

relies on circumstantial evidence, that evidence must be 'specific and substantial' to defeat the employer's motion for summary judgment." *Id.* at 1088 (citation omitted). "Here, because [Kahle] seeks to rely solely on circumstantial evidence of pretext—she attempts to show that [Defendant's] proffered reasons are unworthy of credence—the 'specific and substantial' standard applies." *Id.* (citation omitted).

Kahle provides several reasons why Defendant's proffered reason for terminating her was pretextual: (1) "there is no track record" of her "rude and insubordinate behavior" "until after [she] beg[an] to complain about Helms" (Doc. 61 at 19); (2) "Bryant's testimony is inconsistent as to why Kahle was terminated" (*id.*); (3) others, including Helms, were not terminated for engaging in similar conduct (*id.*); (4) "Kahle's termination followed two months after [her] first report" (*id.* at 20); and (5) Defendant was "hostil[e] toward Kahle's complaints about Helms'[s] conduct" (*id.*).

The Court will begin with Kahle's second argument because it is dispositive. In its motion papers, Defendant repeatedly asserts that Kahle's behavior during the May 28, 2023 meeting with Russell and Bryant was the sole reason for the termination decision. (Doc. 46 at 10 ["Kahle was insubordinate/inappropriate during their May 28, 2023 interaction and . . . [Defendant] terminated her for such conduct."]; Doc. 65 at 12 ["Kahle was terminated after she yelled at her superiors, scoffed at them, spoke to them in an inappropriate manner, and refused to follow their directives on May 28, 2023. Such conduct was insubordinate."].) The difficulty with this assertion is that Bryant did not testify that Kahle's behavior during the May 28, 2023 meeting was the sole reason for the termination decision. Instead, Bryant testified "the company chose to terminate [Kahle's] employment" due to Kahle's "track record of being rude and insubordinate" and then clarified that this track record extended "from March [28, 2023] after she talked to me all the way to May [29, 2023] when she was fired." (Doc. 61 at 86.)

A reasonable factfinder could view these explanations as shifting and inconsistent. To be clear, an inference of pretext does not arise when an employer "simply supplement[s]" the original reason it provided for an adverse employment decision, such

as by providing an additional reason that is not incompatible with the original reason. *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 733-34 (7th Cir. 2001) ("[Johnson] says that the alleged vacillation in Nordstrom's reasons for failing to promote her creates an issue of fact as to pretext. . . . [But] pretext [is] demonstrated by not only shifting but also conflicting, and at times retracted, justifications for adverse treatment. Here, Nordstrom simply supplemented its explanations in the context of EEOC charges and litigation; there has been no retraction of any of its reasons for failing to promote Johnson nor are any of its reasons inconsistent or conflicting. Thus, Johnson has failed to demonstrate that Nordstrom's legitimate, nondiscriminatory reasons for failing to promote her to beauty director were pretextual.") (citations omitted) (cited with approval in *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002)). *See also Gonzalez v. US Hum. Rts. Network*, 2022 WL 4781940, *5 (D. Ariz. 2022), *aff'd sub nom.*, 2026 WL 382043 (9th Cir. 2026) ("USHRN was permitted to add to its list of justifications over time. If a later-added justification conflicts with or replaces an earlier-articulated justification, an inference of pretext may arise, but that was not the case here.") (emphasis and citation omitted). Even so, a reasonable factfinder could construe Bryant's testimony that the termination decision was based on a "track record" of incidents as suggesting that none of the individual incidents comprising that track record would have been alone sufficient to justify termination and that it was only the combined weight of all of the incidents that prompted the termination decision. That understanding, in turn, conflicts with Defendant's current position that the termination decision was based on the May 28, 2023 incident alone.

Although the pretext analysis could likely end there, Kahle's first argument—that there is no "paper trail" of her alleged insubordination until after she made the complaints about Helms—provides further support for her claim of pretext and may explain why Defendant now wishes to distance itself from Bryant's testimony and limit the focus to the May 28, 2023 incident. Bryant testified that Kahle "was a good waitress," that "[e]verything was great," and that she was "happy" and "fine" with Kahle throughout

March *and April* of 2023. (Doc. 61 at 67.) A reasonable factfinder could view this testimony as inconsistent with Bryant's testimony, discussed above, that the "track record" of insubordination that ultimately resulted in Kahle's termination began on March 28, 2023, i.e., "from March [28, 2023] after she had talked to me". (*Id.* at 86.)

### B. Count Two (Title VII—Disparate Treatment)

#### 1. The Parties' Arguments

Defendant argues that "Kahle's disparate treatment claim is based upon [Defendant] 'subject[ing] her to targeted write ups.'" (Doc. 46 at 10, citation omitted.) Defendant "does not dispute Kahle falls into a protected class as a woman and that she was qualified for her job." (*Id.*) Nevertheless, Defendant argues that Kahle's disparate treatment "claim fails because her 'targeted write ups' were not adverse employment actions because she was not demoted, receive a pay cut, etc." (*Id.*) Defendant also argues that "Kahle fails to identify any direct comparators." (*Id.*) Defendant continues that "[a]lthough cooks, dishwashers and waitresses are not similarly situated, it is worth noting that Bryant wrote up two male employees (Helms and Mario Martinez) the same month she gave Kahle a verbal warning for using her cell phone" and that "Kahle fails to show a male comparator who was not disciplined for refusing to communicate about his schedule with his superior." (*Id.* at 11.) Next, Defendant argues that even "[i]f Kahle somehow establishes a prima facie claim, the burden shifts to [Defendant] 'to articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory conduct'" and that Defendant "warned/wrote up Kahle because she violated its cell phone policy and refused to communicate with Bryant about her schedule," "has written up male employees for utilizing their cells phones," and "wrote Kahle up for not communicating about her schedule with Bryant [which] was unrelated to her sex." (*Id.*)

In response, Kahle argues that she "suffered two adverse employment actions while employed with [Defendant]. First, her hours were cut from March 28 until around April 7, 2023. The second adverse action was Kahle's termination. Both reducing hours and termination are adverse employment actions." (Doc. 61 at 13.) Next, Kahle argues that

"[a]ll [Defendant] employees were subject to the supervision and direction of the co-owners . . . Bryant and . . . Russel[l]" and "rules about schedule changes and cell phone use applied to all employees, as did the standard that owners would not accept disrespect from employees." (*Id.*) Kahle argues that, therefore, "all non-managerial male and female employees, including Kahle and Helms, were similarly situated." (*Id.*) Kahle argues Defendant "treated [her] differently from other non-managerial male employees, in particular . . . Helms" because "[t]he record shows that Kahle's hours were cut when Bryant became concerned about texts between her and Helms, but there is contradictory evidence as to whether [Defendant] also cut Helms'[s] hours." (*Id.*) Next, Kahle argues that she was terminated for a "track record of being rude and insubordinate" but "the reasons given for Kahle's termination are inconsistent, varying from the owners' anger at how Kahle talked to them, and failing to greet and disrespectfully speaking with owners, to claims that Kahle was repeatedly insubordinate in her cell phone use and seek shift coverage." (*Id.* at 13-14.) Kahle argues that "Helms sent disrespectful texts to Bryant, had a pattern of acting out, lied about Bryant to Kahle, and was caught using his phone in May," "[y]et Bryant facilitated odd jobs for Helms prior to Kahle's termination and rehired him" and "[t]his evidence shows Helms was treated more favorably than Kahle." (*Id.* at 14.) Last, Kahle argues that "[w]omen like Kahle were held to a higher standard of behavior while men like Helms misbehaved without consequences" and that "the evidence shows that [Defendant], through its owners, engaged in impermissible sex stereotyping regarding women's sexuality and assertiveness, when considering Kahle's response to an unfair write up about a schedule change and Helm[s]'s texts to Bryant around March 29." (*Id.*)

In reply, Defendant argues that "[t]he Complaint does not cite [Defendant] temporarily changing Kahle's schedule by one hour and/or Kahle's termination as adverse actions giving rise to her disparate treatment claim" and that "Kahle cannot now allege such events to support her claim." (Doc. 65 at 6.) Next, Defendant argues that "Kahle also now claims she was treated differently than 'other non-managerial male employees', but she identifies only Helms as a specific comparator." (*Id.*) Defendant argues that "Helms

was not similarly situated to Kahle" because "[b]y Kahle's own admission, her job as a waitress was a customer service role in the front of the house" while "Helms worked as a dishwasher in the back of the house and did not interact with customers." (*Id.* at 6-7.) Defendant argues that Helms "is not a proper comparator because he had distinct duties and reported to different supervisor than Kahle"—"Helms reported to Montoya, and Kahle reported to Bryant and Russel[l]." (*Id.* at 7.) Defendant argues that Kahle's "claim fails because [she] fails to identify a male comparator who was treated differently than Kahle for engaging in the same conduct" and "does not identify any male comparators who were treated differently than her for reporting similar issues." (*Id.*) Last, Defendant argues that "[t]he allegation that [Defendant] provided Helms 'odd jobs' and rehired him cannot establish disparate treatment" because "Kahle does not allege (nor is there evidence) that she applied for or otherwise inquired about 'odd jobs' or that she attempted to get her job back after [Defendant] terminated her." (*Id.* at 7-8.)

2. <u>Analysis</u>

"[A] plaintiff alleging disparate treatment under Title VII must first establish a prima facie case of discrimination. Specifically, the plaintiff must show that (1) he belongs to a protected class; (2) he was qualified for the position; (3) he was subject to an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably. The burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action. If the employer does so, the plaintiff must show that the articulated reason is pretextual either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Chuang v. Univ. of Calif. Davis, Bd. of Trs.*, 225 F.3d 1115, 1123-24 (9th Cir. 2000) (cleaned up).

In Count Two of the complaint, which is Kahle's claim for discrimination and harassment under Title VII, Kahle alleges that she "was subject to targeted write ups because of her sex." (Doc. 1 at 14 ¶ 101.) This is the only instance of "unlawful

discrimination against Ms. Kahle on the basis of her sex" alleged in Count Two. (*Id.* at 14 ¶ 102.) In contrast, in Count Three of the complaint, which is Kahle's claim for retaliation under Title VII, Kahle alleges that she was subjected to three discrete adverse employment actions in retaliation for her acts of reporting—specifically, "[Defendant] retaliated against [her] by [1] writing her up, [2] singling her out, and [3] terminating her employment because she reported the unlawful sexual discrimination and harassment." (*Id.* at 15 ¶ 118, brackets added.)

As this juxtaposition makes clear, the only fair reading of the Title VII discrimination claim asserted in Count Two is that the claim is based solely on the alleged adverse action of being subjected to "write ups." Because Kahle never amended her complaint to expand the scope of Count Two to encompass the distinct adverse actions of reduced hours or termination, she may not pursue such claims for the first time in a response to a motion for summary judgment. *Navajo Nation*, 535 F.3d at 1079-80; *Chaffin*, 2025 WL 522518 at *4-5; *Capuano*, 2012 WL 2376675 at *1.

Nor has Kahle made any effort in her summary judgment briefing to establish that the "write ups" identified in her complaint could support a Title VII disparate treatment claim. And even if Kahle had made such an argument, it would fail. *See, e.g.*, *Anderson v. Intel Corp.*, 2021 WL 1087127, *10 (D. Ariz. 2021) ("An adverse employment action is one that materially affect[s] the compensation, terms, conditions, or privileges of . . . employment. Several courts within the Ninth Circuit have held that a warning letter is not an adverse employment action, at least where the warning letter does not result in material changes to the conditions or terms of employment.") (cleaned up); *Moore v. Marriott Int'l, Inc.*, 2014 WL 5581046, *10 (D. Ariz. 2014) ("Several courts within the Ninth Circuit have held that a warning letter is not an adverse employment action."). *See also Boston v. Graphic Packaging Int'l, LLC*, 2026 WL 788931, *1 (3d Cir. 2026) (disparate treatment claim failed to the extent it was based on "write-ups"); *Fields v. Am. Airlines, Inc.*, 696 F. Supp. 3d 66, 96 (E.D. Pa. 2023), *aff'd*, 2024 WL 3534478 (3d Cir. 2024) (write-ups did not qualify as adverse actions for purposes of disparate treatment claim); *Stancu v. New*

*York City Parks Dept.*, 2022 WL 4581844, *4 (S.D.N.Y. 2022) (same); *Deasfernandez v. Beaumont Health Sys.*, 154 F. Supp. 3d 534, 538 (E.D. Mich. 2015) (same); *Lumhoo v. Home Depot USA, Inc.*, 229 F. Supp. 2d 121, 150 (E.D.N.Y. 2002) (same).[19]

C. **Count Two (Title VII—Hostile Work Environment)**

1. The Parties' Arguments

Defendant argues that Kahle's hostile work environment claim fails for an array of reasons. (Doc. 46 at 11.) First, Defendant argues that "Kahle fails to establish Helms's alleged harassment was based on sex" because "[s]he attributes Helms's conduct to his refusal to take accountability in their relationship and mental health issues." (*Id.* at 11-12.) Defendant argues that "[c]ourts have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations" and "[t]hat Kahle and Helms previously had a romantic/sexual relationship does not render his alleged harassment sex-based." (*Id.* at 12, cleaned up.) Defendant also argues that "Helms's harassment resulting from his purported mental health conditions is not sex-based" and that "Russell's alleged statements that Kahle should not have dated Helms because of their respective ages is not sex-based because there is no evidence that they were motivated by sexual animus or gender bias." (*Id.*) Second, Defendant argues that "the alleged conduct was not always unwelcome." (*Id.* at 13, cleaned up.) Specifically, Defendant argues that "[a]lthough Helms allegedly began harassing Kahle in October 2022, she did not ask him to stop contacting her" and "she continued voluntarily communicating with him and spending time with him outside of the workplace." (*Id.*) Defendant argues that Kahle also "initiated communications with him at least up until March 27, 2023," and "[t]his suggests

[19] Although, for the reasons stated above, write-ups are not adverse employment actions for purposes of a Title VII disparate treatment claim, write-ups may serve as the underlying adverse employment action for a Title VII retaliation claim. *Drake v Living Spaces Furniture LLC*, 2024 WL 4444315, *17 (D. Ariz. 2024) (explaining that "Title VII retaliation claims may be brought against a much broader range of employer conduct than substantive claims of discrimination" and noting that the "Ninth Circuit has concluded that a formal warning" may constitute an adverse employment action for purposes of a Title VII retaliation claim) (cleaned up).

the alleged harassment was not unwelcome at least until March 28, 2023, when Kahle first reported concerns [to] Bryant." (*Id.*) Third, Defendant argues that the conduct was not "severe or pervasive," as evidenced by the fact that "[a]lthough Helms'[s] harassment began in October 2022, Kahle did not report it to management until March 28, 2023 because at least up until that point, 'he hadn't much brought [the harassment] to the workplace' and she believed he would stop." (*Id.* at 14.) Thus, Defendant argues that, "[a]t best, she did not subjectively believe her work conditions were hostile until late March 2023." (*Id.*) Defendant further argues that "neither Helms's alleged comments nor his 'physical' interactions with Kahle were objectively severe or pervasive enough to change the conditions of her employment" because "Kahle reported to Bryant that Helms said, 'fuck you' to her, called her a 'fat whore', and stated 'Lindsay loves two guys' [in] front of her," and "[a]lthough such statements may be offensive, they are not sufficiently severe and/or pervasive to establish a" hostile work environment. (*Id.*) Moreover, Defendant argues that "Helms's 'physical' conduct that did not injure Kahle, including closing a door on her, hitting her shoulder, splashing water on her, and 'hitting' her with a dish cart, are not sufficiently severe or pervasive to create a [hostile work environment]," "especially" because "two events occurred on the same day (April 11)." (*Id.* at 14-15.) Fourth, Defendant argues that "[b]ecause Helms was Kahle's coworker, [Defendant] may be held liable only if it knew or should have known about sex-based harassment but failed to take corrective measures." (*Id.* at 15.) Defendant argues that it "took measures to prevent workplace sexual harassment by posting notices of relevant laws and telling employees to report such harassment to Bryant." (*Id.*) Defendant also argues that it "cannot be held liable for Helms's conduct that occurred before March 28, 2023, when [Kahle] first reported his conduct to management." (*Id.*) Defendant argues that "[t]he very next day, Bryant took appropriate remedial measures, including changing Kahle and Helms's schedules so that they would not overlap and instructing Helms to not contact Kahle and to cease interacting with her at work." (*Id.*) Defendant also argues that "[o]n April 7, 2023, Bryant honored Kahle's request to revert back to her former schedule, knowing her shifts

would overlap with Helms's" and that Defendant "is not liable for her failure to take advantage of remedial measures or avoid harm." (*Id.*) , Defendant further contends that "immediately after Kahle reported the dish cart and water splashing incidents on April 11, 2023, [Defendant] took further corrective measures by immediately changing Helms's schedule so it no longer overlapped with Kahle's" and that "Montoya also disciplined Helms and advised him that further misconduct would lead to termination." (*Id.* at 15-16.) Defendant argues that "[t]hese remedial measures were successful" because "Kahle admits Helms no longer had 'an opportunity to mess with [her]' after April 11, 2023, and she never reported concerns to management after this." (*Id.* at 16.) Defendant argues that it "cannot be held liable just because Kahle saw Helms 'once or twice' as he was walking out the door after it changed his schedule because she never complained about this and such interactions could not create a [hostile work environment]." (*Id.*) Finally, Defendant argues that it "took even further measures by terminating Helms after his arrest." (*Id.*)

In response, Kahle argues that Defendant is liable for Helms's workplace harassment after March 28, 2023. (Doc. 61 at 14.) Kahle contends that Defendant "failed to ensure that Helms'[s] workplace harassment, assaults, and threats to Kahle ceased, because April 11, 2023, Helms splashed water on Kahle, soaking her clothes, Helms threatened her by saying that the kitchen was 'dangerous' for her, and Helms assaulted Kahle by pushing a dish cart into her." (*Id.* at 15.) Kahle argues that although she "was not injured by either the water or the cart, being assaulted with the instruments of her job such that her co-workers could observe her wet clothing and the collision is both humiliating and interferes with Kahle's job performance." (*Id.*) Kahle also argues that Defendant "cannot put the blame for Helms'[s] repeated harassment, threats or assaults on Kahle" because "Ninth Circuit law is clear: a defendant may not place its remedial burden on a victimized employee." (*Id.*) Next, Kahle argues that "the evidence shows that Kahle's March 27's report and [Defendant's] response did not prevent further harassment and an assault from Helms on April 11, 2023" and "it is an issue of fact as to whether Kahle was performing her job duties in changing the sanitation water." (*Id.* at 16.) Last, Kahle argues

that "[e]ven if the law did not require that corrective measures prevent further harassment, . . . a jury cannot find that [Defendant']s actions were reasonable" because (1) "Bryant testified that she believed Helms did nothing wrong and appears to only have focused on texting during work hours, rather than the underlying harassing and threatening conduct"; (2) "Bryant ignored Kahle's reports about Helms being physical in the workplace, such as when he closed the refrigerator door on Kahle"; and (3) "none of [Defendant's] managers instructed Helms that his contact, communications and conduct toward Kahle had been inappropriate and had to change." (*Id.*)

In reply, Defendant argues that Kahle's response "does not address the Motion's arguments and case law supporting that Helms's alleged harassment was not sex-based" and that "[t]his alone is sufficient to grant summary judgment." (Doc. 65 at 8.) Next, Defendant argues that "Kahle's insistence that 'none of [Defendant's] managers instructed Helms that his contact, communications, and conduct had been inappropriate and had to change' asks the Court to ignore evidence to the contrary" because, on March 29, 2023, "Bryant instructed Helms not to communicate with Kahle at work." (*Id.*) Defendant further notes that on April 13, 2023, "Montoya reprimanded Helms regarding the water splashing incident." (*Id.*) Next, Defendant argues that "Kahle alleges [Defendant] is liable for all of Helms's alleged conduct occurring from March 28, 2023 – May 29, 2023," but "all of Helms's alleged harassing texts, messages, and emails cited in [Kahle's] Response were allegedly sent to Kahle *before* March 28, 2023, when she first reported concerns about Helms to [Defendant]." (*Id.*) Defendant argues that "Kahle does not allege (nor is there any evidence) that she disclosed or otherwise discussed Helms's alleged January 6, 2023 messages, February 14, 2023, or March 27, 2023 communications with a [Defendant] manager while she was an employee" and that "Kahle confirmed the only communications she disclosed were Helms's texts indicating he saw her truck at the dump and calling her a 'fat whore', which she disclosed to Bryant on March 28, 2023." (*Id.* at 8-9.) Defendant contends that it "is not liable for alleged harassment of which it was not aware" and "that Kahle did not continue receiving harassing emails, texts, and messages from Helms[] after

reporting her concerns to Bryant further supports that the remedial measures she took, including instructing Helms to not contact Kahle, were effective." (*Id.* at 9.) Next, Defendant argues that "Kahle seemingly argues that [Defendant] is conclusively liable because it did not prevent the dish cart and water splashing incidents—incidents that both occurred on April 11 and that never occurred before that date or ever again," but "the proper focus for the hostile work environment claim [is] the employer's response to the coworker's conduct." (*Id.*, citation omitted.) Defendant argues that "Kahle does not dispute that after reporting the water splashing incident, [Defendant] took remedial measures, including immediately changing Helms's schedule so it no longer overlapped with Kahle's and disciplining him," and that Kahle herself admitted that "Helms no longer had 'an opportunity to mess with [her]' after April 11, 2023." (*Id.*) Defendant also argues that Kahe's allegation that the dish cart and water splashing incidents were "humiliating and interfere[ed] with [her] job performance" is "conclusory." (*Id.*) Last, Defendant argues that "whether Kahle was performing her job duties while changing the sanitation water is not a material fact dispute," and "Kahle fails to show that being splashed with water on a single occasion is sufficiently severe and/or pervasive to establish a hostile work environment, much less one based on sex." (*Id.* at 10.)

2. <u>Analysis</u>

"Title VII of the Civil Rights Act of 1964 makes it 'an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 63 (1986) (quoting 42 U.S.C. § 2000e-2(a)(1)). One recognized form of sex discrimination under Title VII is a claim based on "the creation of a hostile work environment that 'is sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Fuller v. Idaho Dep't of Corr.*, 865 F.3d 1154, 1161 (9th Cir. 2017) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "A hostile work environment occurs when an employee 1) was subjected to verbal or physical conduct of a sexual nature,

2) this conduct was unwelcome, and 3) this conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (internal quotation and citation omitted).

Where, as here, the harasser is not a supervisor but "is merely a coworker, the plaintiff must prove that . . . the employer knew or should have known of the harassment but did not take adequate steps to address it." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1119 (9th Cir. 2004) (citation omitted).[20]

a. **"Because Of Sex"**

Defendant argues that "Kahle fails to establish Helms's alleged harassment was based on sex." (Doc. 46 at 11-12.) Kahle does not appear to respond to this specific argument. (Doc. 61 at 14-16.) Kahle does, however, argue in connection with her retaliation claim "that Helms'[s] conduct was motivated by sex and prohibited under Title VII" because (1) "[b]y necessity, Helms'[s] misconduct was directed at Kahle because, in addition to being an ex-girlfriend, Kahle was a woman"; and (2) James testified that "Helms had anger toward women in particular, and he focused that on Kahle." (*Id.* at 17.)

On the one hand, several courts have held that harassment based on personal animosity following a failed relationship does not implicate Title VII. For example, in *Succar v. Dade Cnty. Sch. Bd.*, 229 F.3d 1343 (11th Cir. 2000), the "single issue" on appeal was "whether harassment inflicted upon an employee by a co-worker with whom that

[20] "An employer's liability for harassing conduct is evaluated differently when the harasser is a supervisor as opposed to a coworker. An employer is vicariously liable for a hostile work environment created by a supervisor . . . ." *McGinest*, 360 F.3d at 1119 (citations omitted). Although Kahle primarily argues that Defendant is liable for the harassing conduct of her co-worker, Helms, the complaint separately alleges that "Kahle was subjected to sex-based harassment by Ms. Russell by her comments about how Mr. Helms was too young for her, meaning that a woman cannot have a relationship with a younger man." (Doc. 1 at 14 ¶ 108.) In her response brief, Kahle argues that in April 2023, "Russell lectured that because Kahle was the older of the two and a woman, she was responsible for Helms'[s] conduct." (Doc. 61 at 8.) But Kahle cites no deposition testimony or other evidence to support this statement. The Court has reviewed what it believes to be the portion of Kahle's deposition testimony discussing her conversation with Russell, and Kahle did not testify that Russell stated or implied that Kahle should not be dating younger men *because she is a woman.* (*Id.* at 165-67. *See also* Doc. 46-1 at 47-48.) Moreover, Kahle doesn't argue in her brief that this alleged statement by Russell is the basis for her hostile work environment claim. (Doc. 61 at 14-16.) Accordingly, the Court will only address Helms's alleged acts of sex-based harassment.

employee had a consensual sexual relationship is actionable under Title VII . . . under a 'hostile work environment' theory of recovery." *Id.* at 1344. The facts of *Succar* are similar to the facts here. There, "Succar, who was married, commenced a consensual sexual relationship with Clemencia Lorenz, a fellow teacher." *Id.* "Near the end of the one-year relationship, Lorenz began making threatening overtures towards Succar's wife and son," and "the relationship between Succar and Lorenz deteriorated rapidly and eventually ended." *Id.* Following the end of their relationship, Lorenz "verbally and physically harassed Succar." *Id.* "Succar insist[ed] that he did nothing to encourage this behavior and took steps to quell it, including avoiding Lorenz whenever possible and reporting the incidents to the school's principal. Succar maintain[ed] that the principal took insufficient steps to remedy the situation, thereby allowing the harassment to continue unabated." *Id.* Succar brought a Title VII hostile work environment claim, the district court granted summary judgment to the defendant, and the Eleventh Circuit affirmed. *Id.* at 1344-45. The court held that Succar failed to establish "that his sex was the underlying reason for the harassment he allegedly suffered." *Id.* at 1345. The court explained that "[p]ersonal animosity is not the equivalent of sex discrimination. The plaintiff cannot turn a personal feud into a sex discrimination case." *Id.* (cleaned up). Noting that the analysis must "focus[] only on whether the complaining employee was targeted because of his or her gender," the court held:

> Lorenz's harassment of Plaintiff was not the result of Plaintiff's gender but of responses to an individual because of her former intimate place in that individual's life. In other words, Lorenz's harassment of Succar was motivated not by his male gender, but rather by Lorenz's contempt for Succar following their failed relationship; Succar's gender was merely coincidental.

*Id.* (cleaned up).

Similarly, in *Lial v. Cnty. of Stanislaus*, 2010 WL 4877777 (E.D. Cal. 2010), the court, relying on the district court's decision in *Succar*, held that the "record lack[ed] evidence that purported harassment of Ms. Lial was based on her sex." *Id.* at *13. The court noted that "in her deposition, Ms. Lial attributed Mr. Woodward's harassment to her

ending their romantic relationship. As such, Ms. Lial concede[d] that her gender was not the impetus for Mr. Woodward's conduct." *Id.*

Here, Kahle testified that when she initially told Bryant about what was happening with Helms, she stated:

> I'm having a problem with [Helms]. . . . We were seeing each other for a while and it didn't work out, and he's taking it real bad, and he's been texting me crazy stuff for a while, but now he's starting to do stuff at work. So I warned him that if he kept doing stuff at work I would tell you, and he is.

(Doc. 61 at 148.) At least when viewed in isolation, this testimony tends to support that Helms's alleged harassment of Kahle was "because of" his personal animosity toward her as a result of their relationship ending, not "because" she is a woman. *See also Conklin v. Cnty. of Suffolk*, 859 F. Supp. 2d 415, 428 (E.D.N.Y. 2012) ("[C]ourts often find that harassment by a co-worker is not considered to be 'based on sex' when it arises from a failed relationship.").

On the other hand, courts have also held that when an alleged harasser uses "sexually degrading, gender-specific epithets"—even when that language is used by one co-worker to describe another co-worker after their failed relationship—that may constitute harassment under Title VII. *Forrest v. Brinker Int'l Payroll Co., LP*, 511 F.3d 225, 229 (1st Cir. 2007). *See also Bradford v. Precision Dynamic Corp.*, 2008 WL 11336611, *3 (C.D. Cal. 2008) (citing *Fuller v. City of Oakland*, 47 F.3d 1522, 1527-28 (9th Cir. 1995)) ("It is important at the outset to establish that a viable claim of sex harassment may exist when the alleged harasser and the victim were previously involved in a romantic relationship. . . . There is no reason that an alleged harasser, who likely pursued a personal relationship in the first instance because of a person's sex, cannot later be found to harass that person because of sex. A prior intimate relationship may factor into the ultimate question of discrimination, as a jury is entitled to consider whether alleged acts of harassment were based upon a person's status as a former lover or rather based on a person's sex. Yet no matter if one seeks to initiate a new intimate bond or to rekindle an old flame, harassment is still harassment. Thus, the fact that Mosher and Bradford had a

prior personal relationship does not itself preclude a claim of sexual harassment.") (cleaned up).

The facts of *Forrest* are nearly identical to those here. "Forrest worked as a server and then a bartender at Chili's Bar and Restaurant" and "began to date her co-worker Vashaw, who was employed as a line cook at the same restaurant." 511 F.3d at 227. "Forrest and Vashaw continued to see each other socially . . . and engaged in intimate relations as late as January 2005. In March of 2005, Forrest began dating another man, Jeremy Gregor. Vashaw, apparently upset by Forrest's new relationship, questioned Forrest frequently about Gregor, began to call her names such as 'whore' and 'bitch,' and refused to give her things she needed in the kitchen." *Id.* Even after Forrest reported this behavior to the general manager, and the general manager gave Vashaw a verbal warning to stop his behavior, Vashaw continued "calling her names such as 'whore,' 'slut,' 'bitch,' and 'cunt.'" *Id.* Thereafter, Forrest reported to the general manager that—similar to Helms—"Vashaw had squirted her with hot water . . . , had acted rudely towards her, had cornered her in a walk-in cooler, called her a whore and other names, as well as telling her she was fat . . . ." *Id.* The magistrate judge rejected Forrest's hostile work environment claim on the ground that Vashaw's conduct did not "cross the line" from "retribution after a failed romantic relationship" into "Title VII harassment" but the First Circuit reversed, emphasizing that the gendered language Vashaw had used could lead a reasonable factfinder to conclude that his actions, even though directed at a former paramour, were "based upon sex":

> A raft of case law, however, establishes that the use of sexually degrading, gender-specific epithets, such as "slut," "cunt," "whore," and "bitch," with which Vashaw barraged Forrest at work, has been consistently held to constitute harassment based upon sex.

*Id.* at 229.

The Court has been unable to locate a Ninth Circuit case specifically addressing whether harassing conduct, including use of gendered epithets, directed at a co-worker by another co-worker following their failed relationship constitutes a "personal animosity"

outside the ambit of Title VII or harassment "because of sex" within the ambit of Title VII. That being said, just a few years ago, the Ninth Circuit cited *Forrest* with approval in holding that a workplace saturated with music that uses "sexually derogatory" language can create a hostile work environment under Title VII. *Sharp v. S&S Activewear, L.L.C.*, 69 F.4th 974, 979 (9th Cir. 2023). And in an unpublished decision, the Ninth Circuit held (albeit outside the context of a failed relationship) that where a plaintiff was "repeatedly and aggressively called a 'bitch,' often in response to routine questions, and called . . . a 'fucking bitch' and a 'cunt' once, in addition to various gender-neutral abusive conduct . . . a jury could find that, in these circumstances, [the defendant's] repeated and aggressive use of the epithets was because of [the plaintiff's] sex." *Ochs v. Eugene Emeralds Baseball Club, Inc.*, 774 F. App'x 1026, 1028 (9th Cir. 2019). In light of these authorities, the Court accepts that a Title VII hostile work environment claim may be predicated on a male employee using gendered epithets to describe a female employee after their consensual relationship ended.

There is evidence that Helms used gendered epithets to describe women, including Kahle, that he believed were unchaste. For example, Kahle testified that Helms "had his own opinion of what women should be like" and "held women to a standard of purity" to which he did not hold men. (Doc. 46-1 at 23.) Kahle also testified that Helms "called [her] whore a bazillion times, slut. All of it, yes." (*Id.* at 24.) There is documentary proof of these epithets—for example, on March 27, 2023, Helms sent Kahle several messages while she was working at the café in which he referred to Kahle as a "whore" and "cunt." (Doc. 61 at 341-46.) The latter word, in particular, can easily be viewed by a reasonable factfinder as a sex-based insult. *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 812 (11th Cir. 2010) ("'Cunt,' referring to a woman's vagina, is the essence of a gender-specific slur."). Furthermore, James testified that although she heard Helms call women "whores and sluts and cunts," she never heard Helms use derogatory language to describe men who had extramarital affairs. (Doc. 61 at 297.) Accordingly, a reasonable juror could conclude that Helms's repeated use of gendered epithets, including directed at Kahle, was

sex-based discrimination.

Moreover, although some of the alleged acts of harassment by Helms may be facially sex-neutral (e.g., pushing a dish cart into Kahle, splashing hot water on her, slamming a door on her), that does not necessarily render those incidents irrelevant. "As the Second Circuit has explained in the hostile work environment context: 'Facially neutral incidents may be included . . . so long as a reasonable fact-finder could conclude that they were, in fact, based on sex. But this requires some circumstantial or other basis for inferring that incidents sex-neutral on their face were discriminatory.' For example, a 'fact-finder could reasonably infer that facially sex-neutral incidents were sex-based where the perpetrator had previously made sexually derogatory statements.'" *Ruiz v. Magellan Fin. & Ins. Servs.*, 2025 WL 1796275, *11 (D. Ariz. 2025) (quoting *Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002)). *See also Ochs*, 774 F. App'x at 1028 (considering use of gendered epithets such as "fucking bitch" and "cunt," as well as "various gender-neutral abusive conduct" in holding that a reasonable juror could conclude the defendant's conduct was "based on sex"). Here, in light of the evidence of Helms's repeated references to Kahle as "slut," "whore," "cunt" and/or "bitch," a reasonable factfinder could conclude that the other facially sex-neutral incidents of harassment were also, in fact, because of Kahle's sex.

b. **Unwelcome**

Defendant argues that "the alleged conduct was not always unwelcome" and that because Kahle "voluntarily communicat[ed] with [Helms] and spen[t] time with him outside of the workplace," as well as "initiated communications with him at least up until May 27, 2023," "the alleged harassment was not unwelcome at least until March 28, 2023." (Doc. 46 at 13.)

This argument lacks merit. A reasonable juror could conclude that Helms's conduct was unwelcome even before Kahle reported her concerns to Bryant on March 28, 2023. Kahle testified that before she reported Helms's conduct to Bryant, she told Helms both in person and via text that if he didn't stop harassing her, she would report it to Bryant. (Doc.

61 at 146.) Kahle also testified that she repeatedly told him to stop and repeatedly blocked fake numbers Helms was using to contact her. (*Id.* at 147.) Kahle also testified that, as early as October 2022, she told Helms to "Please stop." (Doc. 46-1 at 19.) In a text message to Helms the day before she reported his conduct to Bryant, Kahle wrote: "Pleassssse stop!!! How can you say that to me!!!?????? How?!?? How??" (Doc. 61 at 341.)

c. **Severe Or Pervasive**

"To determine if an environment is sufficiently hostile or abusive to violate Title VII, we look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 872 (9th Cir. 2001) (cleaned up). "The required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct." *Id.* (cleaned up). "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* (cleaned up).

A reasonable juror could conclude that Helms's alleged conduct was severe and/or pervasive. On this point, the relevant chronology is as follows:

- In October 2022, while Kahle was trick-or-treating with her children, Helms texted Kahle: "I see you, you fucking bitch. I'm going to come show the kids what happens when your mom is a whore." (Doc. 46-1 at 18.)

- In January 2023, Helms wrote to Kahle: "How fun do you think work is going to be if you don't unblock my cell and call me back." (Doc. 61 at 326.)

- Also in January 2023, Helms showed up to Kahle's house while Kahle was home alone with her kids. (Doc. 46-1 at 25.) Kahle's house is in "a rural area . . . eight miles off of pavement." (*Id.*) Helms "dropped a pair of [Kahle's] underwear on [her] fencepost and left." (*Id.* at 26.)

- On February 14, 2023, Helms emailed Kahle several messages, stating, among other things:

- "Shut the fuck up. Get aids. Die in a fire. Fuck off you dumb fucking whore" (Doc. 61 at 329);
- "I'm going to cram my pipe wrench up [Kahle's husband's] ass while he bleeds to death from my dick in his eye socket. Hope you're all ready" (*id.*);
- "You hear me you dumb fucking bitch? Tonight's the night I fucking lose it" (*id.*);
- "Have that little bitch [Kahle's husband] leave the light on for me tonight. I need to demonstrate to his kids what it looks like when dad gets skull fucked to death" (*id.*).

- Between February and March 2023, Helms said "[f]uck you" to Kahle (*id.* at 136); slammed a door on her (*id.*; *id.* at 131-32); and locked her out of the café (*id.* at 136).
- Helms made a statement to another waitress about Kahle "lov[ing] two guys." (*Id.* at 137.)
- Helms stated to Kahle: "If I put sugar in your gas tank, whose fault is that?" (*Id.* at 145.)
- On March 27, 2023, Helms texted Kahle, among other things:
  - "You know what I don't see when I look in the mirror? My wife standing next to me while I fuck other women." (*Id.* at 341).[21]
  - "You fucking evil vile piece of shit." (*Id.*)
  - "I hate you you evil fucking whore." (*Id.*)
  - "Jump off the grand canyon you juvenile fucking cunt." (*Id.*)
  - "I hope a random mugger robs the restaurant and shoots you in the throat you worthless shitstain." (*Id.*)
  - "Go fucking die already. Fucking die you evil fucking whore." (*Id.*)

---

[21] Based on context, a reasonable juror could conclude that Helms was making a remark about Kahle having a sexual relationship with him while still legally married to, and still living with, her husband.

- "Literally everyone is going to see your shitty nudes I'm posting them to the Hyde park facebook." (*Id.* at 342.)

- "I said I hope you die today you fucking whore." (*Id.* at 343.)

- "You are a grade a dumb fucking retard. Hope you like living through hell you fucking cunt." (*Id.* at 344.)

- "Go fucking die you evil cunt." (*Id.* at 346.)[22]

- On April 11, 2023, Helms splashed hot water on Kahle and told her she couldn't be "back here" because "[i]t's dangerous for [her]." (*Id.* at 175-77.)

- That same day, Helms pushed a dish cart into Kahle. (*Id.* at 169-70.)

- On May 11, 2023, Helms was arrested after attempting to post a nude photo of Kahle on Facebook. (Doc. 46-1 at 62-64.)

Notably, several of these messages were sent by Helms from different phone numbers because Kahle would block Helms's number to prevent his messages from reaching her, yet Helms would persist. Kahle separately testified that Helms "called [her] a whore a bazillion times, slut. All of it, yes." (Doc. 61 at 134.) Kahle also testified that Helms "was slut shaming" her. (*Id.* at 203.) Kahle also testified that Helms had sent her a text message calling her a "fat whore." (*Id.* at 151.) James also testified that Helms "often" called her a "whore" and also a "slut." (*Id.* at 300.)

In *Ochs*, the plaintiff asserted claims under Oregon statutes "for hostile work environment, sex/gender discrimination, and retaliation against her former employer," Emeralds. 774 F. App'x at 1027. The Ninth Circuit first noted that the Oregon statutes at issue are "modeled after Title VII" and "federal cases interpreting Title VII are instructive." *Id.* at 1027-28 (citations omitted). Next, the court "reverse[d] the district court's grant of summary judgment on Ochs's hostile work environment claim." *Id.* at 1028. The court

---

[22] There are still more text messages that don't appear to be cited by Kahle but are attached to Defendant's motion. (*See, e.g.*, Doc. 46-1 at 120 ["You're an evil lying whore and I'm really excited for the day you die you fucking bitch. Your husband is dead."]; *id.* at 122 [Helms discussing the water-splashing incident and stating: "You know how much worse shit I could have done."].)

held as follows:

> Ochs presented evidence that, for a period of roughly three years, Benavides repeatedly and aggressively called her a "bitch," often in response to routine questions, and called her a "fucking bitch" and a "cunt" once, in addition to various gender-neutral abusive conduct. Although such epithets may not satisfy the "because of sex" factor in all contexts, a jury could find that, in these circumstances, Benavides's repeated and aggressive use of the epithets was because of Ochs's sex. *A reasonable jury also might find Benavides's conduct objectively severe or pervasive enough to "alter the conditions of Ochs's employment and create an abusive working environment." And a reasonable jury could conclude that Ochs subjectively perceived her work environment to be abusive because she informed Benavides his conduct was disrespectful; complained about Benavides's conduct to coworkers;* and felt she was being undermined by Benavides's conduct.

*Id.* (cleaned up, emphasis added.)

Similarly, in *Nichols*, the plaintiff, Sanchez, brought a claim for sexual harassment under Title VII. 256 F.3d at 869. "Sanchez claimed that he was verbally harassed by some male co-workers and a supervisor because he was effeminate and did not meet their views of a male stereotype." *Id.* "Following a bench trial, the district court entered judgment in favor of Azteca," but the Ninth Circuit reversed. *Id.* In holding that Sanchez had shown that his work environment was objectively hostile, the court held:

> At trial, Sanchez testified that he endured an unrelenting barrage of verbal abuse while employed at Azteca. Specifically, Sanchez testified that other Azteca employees habitually called him sexually derogatory names, referred to him with the female gender, and taunted him for behaving like a woman.
>
> . . .
>
> Having reviewed the record, we hold that a reasonable man would have found the sustained campaign of taunts, directed at Sanchez and designed to humiliate and anger him, sufficiently severe and pervasive to alter the terms and conditions of his employment.

*Id.* at 872-73.

Here, too, a reasonable factfinder could conclude that Helms's sex-based harassment of Kahle was sufficiently severe and pervasive to support a Title VII hostile work environment claim.

d. **Defendant's Liability**

"Once an employer knows or should know of co-worker harassment, a remedial obligation kicks in." *Nichols*, 256 F.3d at 875 (cleaned up). "An employer is liable for the hostile work environment created by a co-worker unless the employer takes adequate remedial measures in order to avoid liability." *Id.* (cleaned up). "In this circuit, as in others, remedies for sexual harassment should be reasonably calculated to end the harassment." *Id.* (cleaned up.) "The reasonableness of the remedy depends on its ability to: (1) stop harassment by the person who engaged in harassment; and (2) persuade potential harassers to refrain from unlawful conduct." *Id.* (cleaned up).

As an initial matter, both parties appear to operate from the misimpression that the only harassment for which Defendant may be held liable is that which occurred after Kahle's first report to management on March 28, 2023. (Doc. 61 at 14-16; Doc. 65 at 8-10.) True, "[t]he employer's liability, if any, runs only from the time it knew or should have known about the conduct and failed to stop it." *Swenson v. Potter*, 271 F.3d 1184, 1192 (9th Cir. 2001) (internal quotations and citation omitted). But "[w]hen the employer undertakes no remedy, or where the remedy does not end the current harassment and deter future harassment, *liability attaches for both the past harassment and any future harassment*." *Nichols*, 256 F.3d at 875-76 (emphasis added).

Turning to the merits, a reasonable factfinder could conclude that Defendant's response to Kahle's March 28, 2023 report was inadequate. Defendant argues its response was adequate because the "very next day," Bryant "chang[ed] Kahle['s] and Helms's schedules so that they would not overlap and instruct[ed] Helms to not contact Kahle and to cease interacting with her at work." (Doc. 46 at 15.)

As for Bryant's instruction to Helms, a reasonable juror could find it inadequate for several reasons. First, Bryant testified that she told Helms that "he was forbidden to contact [Kahle] *during working hours*" and had to "cease contact *in the restaurant . . . but not outside of the restaurant*." (Doc. 46-2 at 21, 36, emphases added.) Bryant's notes also state that she talked to Helms "and asked him to please do not call or tex[t] [Kahle] while

she is working. *What happens outside of the restaurant is there [sic] business.*" (*Id.* at 42, emphasis added.) The Ninth Circuit has held that "evidence of management-level, intra-workplace ratification of or acquiescence to offsite conduct by employees, customers, or third parties can be particularly relevant to both the hostile work environment and employer liability elements of a Title VII claim." *Okonowsky v. Garland*, 109 F.4th 1166, 1180-81 (9th Cir. 2024). Put another way, "even if discriminatory or intimidating conduct occurs wholly offsite, it remains relevant to the extent it affects the employee's working environment." *Id.* at 1181. A reasonable juror could conclude that only instructing Helms to refrain from harassing Kahle *at work* was an inadequate remedy, particularly where (as here) the offsite harassment then continued afterward. *Fuller*, 47 F.3d at 1529 ("Our prior cases stand for the proposition that an employer's actions will not necessarily shield it from liability if harassment continues."). Kahle testified that she continued receiving harassing text messages as late as May 7, 2023 while she was at work but Helms was offsite, and vice versa (Doc. 61 at 184),[23] and Kahle has supplied evidence that, also in May 2023, Helms attempted to publish nude photos of her on Facebook (*id.* at 358).

There is also a genuine issue of material fact whether Helms's hours were actually changed following Kahle's March 28, 2023 report in such a way that would avoid their time at work overlapping. Kahle has come forth with evidence that, whether or not Helms's hours formally changed, (1) Helms was still routinely present at the restaurant when she would arrive for work (*id.* at 157, 159); and (2) on one of those days where she overlapped with Helms, Kahle found out that Helms was still at the restaurant because Bryant had "asked him to stay and look at the slicer" (*id.* at 158). A reasonable juror could thus conclude that Defendant did not, in fact, implement a procedure to prevent Kahle's and Helms's work hours from overlapping and that all Defendant did was simply ask Helms to

[23] Defendant argues that the fact "Kahle did not continue receiving harassing emails, texts, and messages from Helms[] after reporting her concerns to Bryant further supports that the remedial measures she took, including instructing Helms not to contact Kahle, were effective." (Doc. 65 at 9.) But taking the evidence in the light most favorable to Kahle, Kahle continued receiving harassing text messages in May 2023. (Doc. 61 at 184. *See also* Doc. 46-1 at 122 [Helms texting Kahle after the April 2023 water-splashing incident: "You know how much worse shit I could have done."].)

stop contacting Kahle while at work.

A reasonable fact finder could also conclude that Defendant's response to Kahle's April 11, 2023 report was inadequate. Defendant contends its remedial actions following that report were adequate because (1) Montoya orally rebuked Helms for his conduct and threatened consequences if it continued; and (2) Helms's hours were changed to no longer overlap with Kahle's, and Kahle testified that Helms no longer had "an opportunity to mess with [her]." (Doc. 46 at 15-16.) As for Montoya's oral rebuke, the Ninth Circuit has held that "initial counseling and warning that [the harasser] would be subject to future disciplinary actions would [be] sufficient" if the harassment does not continue. *Intlekofer v. Turnage*, 973 F.2d 773, 780 (9th Cir. 1992). But as discussed, the harassment here did continue—in May 2023, Helms threatened to post nude photos of Kahle on Facebook and continued sending her harassing text messages. If the harasser does "not discontinue the unwanted contact," the employer is "required by Title VII . . . to carry through with its threat to discipline him more severely." *Id.* Although Defendant appears to argue that it did follow through by terminating Helms's employment after he was arrested for harassing Kahle (Doc. 46 at 16), there is no evidence that Helms was, in fact, "terminated" and Kahle has, in any event, come forth with evidence that (1) Russell and/or Bryant helped bail Helms out of jail (Doc. 61 at 64, 208-09, 287); (2) Kahle felt pressured by Bryant/Russell to drop the charges against Helms (*id.* at 194); (3) Bryant/Russell gave Helms side jobs while he was out of work (*id.* at 365, 367-68); and (4) Helms was rehired after being arrested (*id.* at 104). *Cf. Fuller*, 865 F.3d at 1162 (finding a "triable issues of fact as to the existence of a hostile work environment" where plaintiff came forth with evidence that her employer "vocally and financially support[ed] her rapist"). As for changing Helms's hours, that may have prevented harassment from physically occurring on premises at the café, but viewing the evidence in the light most favorable to Kahle, it utterly failed to prevent harassment outside the workplace that otherwise affected Kahle's workplace experiences.

Finally, Defendant argues it cannot be held liable for the text messages Helms sent

to Kahle "*before* March 28, 2023, when she first reported concerns about Helms to" Defendant because "Kahle does not allege (nor is there any evidence) that she disclosed or otherwise discussed Helms's alleged January 6, 2023 messages, February 14, 2023, or March 27, 2023 communications with a [Defendant] manager while she was an employee." (Doc. 65 at 8-9.) But Kahle testified although she only *showed* Bryant two texts, she told Bryant that "in general there was a lot of texts." (Doc. 46-1 at 29, 36.) Bryant's notes from her discussion with Kahle are consistent with that testimony—they state that Kahle told Bryant that Helms "is calling & texting her when she is working. Very awful things." (Doc. 46-2 at 41.) Bryant also testified that although she did not "go through [Kahle's] phone," Kahle did tell her that Helms was "threatening [her]," and Bryant testified "they were very bad threats." (Doc. 61 at 39.) Notably, the day after Bryant spoke with Kahle, Bryant messaged Helms, stating: "Please quit texting [Kahle] during work hours Please [Helms] i asked you to do this outside of the restaurant thank you" and "That's fine [Helms] you can absolutely use your phone at lunch please im not firing you its just this situation with [Kahle] *she sent me all the texts you sent her.*" (*Id.* at 363, emphasis added.) Moreover, Kahle testified that she told Russell during her report on April 11, 2023 that Helms had been sending her "these crazy texts" and "say[ing] threatening things" and that Russell responded "[d]on't show me any of the texts. I don't want anything to do with it." (*Id.* at 172.) Although Kahle may not have shown Bryant and Russell every individual text message that Helms sent her, a reasonable juror could conclude that Defendant had knowledge of the text messages at issue.

D. **Count Three (Title VII Retaliation)**

1. <u>The Parties' Arguments</u>

Defendant argues that "Kahle's retaliation claim fails because there was no protected activity." (Doc. 46 at 16.) Specifically, Defendant argues that "Kahle alleges her protected activities include reporting: 1) Helms's harassment and 2) being treated differently by [Defendant] because of her sex," but "reporting Helms's harassment was not a protected activity because she did not report nor did [Defendant] otherwise understand

her to report sex-based harassment." (*Id.*) Defendant also argues that "Kahle cannot show causation" because "Russel[l] terminated Kahle for the inappropriate way she spoke to her and Bryant on May 28, 2023" and "Kahle has furnished no evidence to the contrary." (*Id.* at 17.) Last, Defendant argues that "[e]ven if [Kahle] establishes a prima facie claim, [Defendant] is still entitled to summary judgment because, as set forth above, it has set forth a legitimate, non-discriminatory reason for terminating her." (*Id.*)

In response, Kahle argues that "there are no magic words for a report to be a protected activity." (Doc. 61 at 16.) Kahle argues that she "twice engaged in a protected activity, first on March 28 and again on April 11, 2023, when she reported to [Defendant's] owners of Helms'[s] harassment, assaults, and threats in the workplace." (*Id.* at 16-17.) Kahle disputes Defendant's argument "that these reports were not protected activity because [Defendant] owners did not understand them to be reports of sex discrimination or harassment" and because they "conveyed only an interpersonal conflict subsequent to a break-up, and not gender-based harassment." (*Id.* at 17.) Kahle argues that, "[b]y necessity, Helms'[s] misconduct was directed at Kahle because, in addition to being an ex-girlfriend, Kahle was a woman" and that "James'[s] testimony supports this argument, because Helms had anger toward women in particular, and he focused that on Kahle." (*Id.*) Thus, Kahle argues that her "complaints provide enough information that Helms'[s] conduct was motivated by sex and prohibited under Title VII." (*Id.*) Next, Kahle argues that "[e]ven a small reduction in hours (and corresponding reduction in pay)" may qualify as an adverse employment action to support a Title VII retaliation claim. (*Id.*) Kahle also argues that "[t]emporal proximity between a protected activity and adverse employment action is strong evidence of retaliation." (*Id.*) Kahle further argues that "[b]ecause [Defendant] cut [her] hours immediately after [her] March 27 complaint to Bryant, and Bryant was clear that this action was motivated by Kahle's complaint, [Defendant] is not entitled to summary judgment with respect to the reduced hours." (*Id.*) Next, Kahle argues that "[i]n cases where there is both temporal proximity between the protected activity and contemporaneous evidence of an employer's displeasure with the plaintiff, there is strong

circumstantial evidence of retaliation." (*Id.* at 18.) Specifically, Kahle argues that her "April 11 meeting with Russell was less about Kahle's complaints that Helms continued to threaten and assault her at work—although this was part of it—and more about Russell's displeasure with Kahle previously having a romantic relationship with Helms such that he was angry with her and then failing to avoid Helms at work." (*Id.*) Kahle argues that this "displeasure with Kahle persisted, as she faced daily criticism from managers, including for failing to say hello to [Bryant] at one shift." (*Id.*) Kahle argues that Defendant's "overall response to Kahle's complaints was to treat them as interpersonal conflicts for which Kahle had primarily responsibility, rather than a workplace safety issue triggered by Helms'[s] threats and assaults." (*Id.*) And Kahle argues that, "[a]lso suggestive of the causal connection between Kahle's reports against Helms and the retaliatory termination is Russell subjecting Kahle to pressure about dropping the criminal charges against Helms mere weeks before her termination" and the fact that Defendant "had never previously documented any discipline or criticism of Kahle, but suddenly in May, Kahle received a written verbal warning and a disciplinary write-up" and "Kahle expressed her opposition to the write-up, believing it was retaliatory." (*Id.*)

In reply, Defendant argues that it "does not argue Kahle's retaliation claim fails because she did not use 'magic words.'" (Doc. 65 at 10.) Instead, Defendant argues that "by Kahle's own admission, she never reported sex-based discrimination or harassment." (*Id.*) Defendant argues that "[i]nstead of producing evidence she reported sex-based harassment, Kahle summarily concludes, 'By necessity, Helms'[s] misconduct was directed at Kahle because, in addition to being an ex-girlfriend, Kahle was a woman,'" and that Kahle "cites no caselaw supporting her position—presumably because courts have repeatedly rejected it." (*Id.* at 10-11.) Next, Defendant argues that "James's testimony about Helms's alleged 'anger toward women' is inadmissible because James, Kahle, and Helms never worked at [the café] at the same time, and James has no firsthand knowledge of Kahle and Helms's interactions. Instead, her purported knowledge of the underlying events is based entirely upon hearsay." (*Id.* at 11.) Defendant also argues that Kahle "fails

to explain how Helms's alleged conduct that occurred six months after Kahle's termination could plausibly be relevant to her retaliation claim or otherwise place [Defendant] on notice that Kahle reported sex-based harassment while she was an employee." (*Id.*) Next, Defendant argues that the change to Kahle's schedule following the March 28, 2023 report "cannot support her retaliation claim for at least three reasons": (1) "Kahle did not allege this was a retaliatory act in her Complaint"; (2) "there is no dispute that [Defendant] changed Kahle's schedule so that it no longer overlapped with Helms's"; and (3) "when Kahle requested to revert back to the prior schedule, [Defendant] immediately complied." (*Id.*) Defendant again argues that "Kahle cannot rely on temporal proximity to establish causation." (*Id.* at 12.) Defendant further argues that its "alleged 'displeasure' with Kahle does not establish causation" because "Kahle fails to show Russell's alleged statements about her disapproval of Kahle's prior relationship with Helms was motivated by gender bias" and Kahle "admits neither Bryant nor Russell requested/demanded that she drop the charges against Helms." (*Id.*) Last, Defendant argues that Kahle "fails to show pretext" because Defendant "has not offered inconsistent reasons for Kahle's termination." (*Id.*)

2. <u>Analysis</u>

"Title VII's antiretaliation provision forbids employer actions that discriminate against an employee . . . because he has opposed a practice that Title VII forbids or has made a charge, testified, assisted, or participated in a Title VII investigation, proceeding, or hearing." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) (cleaned up). Title VII retaliation "claims follow the same burden-shifting framework described in *McDonnell Douglas*." *Dawson v. Entek Int'l*, 630 F.3d 928, 936 (9th Cir. 2011). "To establish a prima facie case, the employee must show that he engaged in a protected activity, he was subsequently subjected to an adverse employment action, and that a causal link exists between the two." *Id.* "The causal link can be inferred from circumstantial evidence such as the employer's knowledge of the protected activities and the proximity in time between the protected activity and the adverse action." *Id.* "If a plaintiff has asserted a prima facie retaliation claim, the burden shifts to the defendant to articulate a legitimate

nondiscriminatory reason for its decision." *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000). "If the defendant articulates such a reason, the plaintiff bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive." *Id.*

a. **Protected Activity**

A reasonable juror could conclude that Kahle reported sex-based harassment by Helms to Defendant, thus engaging in a Title VII protected activity. At her deposition, Kahle testified: "[W]hen I reported [Helms] harassing me, I said that he was sexist and, like attacking me because I was a woman. That was when I reported [Helms]. . . . I told [Bryant] that [Helms] had sexist tendencies, the slut, all that." (Doc. 61 at 202.) Kahle also testified that she told Bryant that Helms "hates women and that a lot of the things he was saying was slut shaming and that he hates women and that he—you know, I'm a target now the kind of woman that he gets all hateful about." (*Id.* at 203.)

b. **Adverse Employment Action**

Defendant does not appear to dispute that Kahle was subjected to an adverse employment action. It is therefore unnecessary to decide, at least at this stage of the case, whether Kahle may premise her Title VII retaliation claim not only on the three adverse actions alleged in the paragraph 118 of the complaint (i.e., "writing her up, singling her out, and terminating her employment") but also based on experiencing a reduction in hours following her March 28, 2023 complaint.

c. **Causation And Burden-Shifting**

Defendant argues that "Kahle cannot show causation" because Defendant "has set forth a legitimate, non-discriminatory reason for terminating her." (*Id.* at 17.) For the same reasons discussed in relation to Kahle's AEPA claim, Kahle has established prima facie causation (based, at a minimum, on temporal proximity); Defendant has come forward with a legitimate, non-discriminatory reason for terminating Kahle; and Kahle has raised a genuine dispute as to whether Defendant's proffered reason for terminating her was pretextual.

II. Kahle's Motion for Summary Judgment On Counterclaims

A. **False Light Invasion Of Privacy**

1. The Parties' Arguments

Kahle argues that "Counterclaimants cannot establish a prima facie case because it has not shown that Ms. Kahle had knowledge of a false statement and produced it anyway placing Counterclaimants in a false light." (Doc. 47 at 14.) Specifically, Kahle argues that she "did not knowingly or recklessly publicize any information about [Counterclaimants]," and "Counterclaimants have presented no evidence of Ms. Kahle's mental state for their false light invasion of privacy claims." (*Id.*) Next, Kahle argues that her "alleged statements did not give publicity to information that would place Counterclaimants in a false light." (*Id.*) Specifically, Kahle argues that "[t]he alleged statements that Counterclaimants have provided have only allegedly been stated to a handful of former colleagues who are or were employees of [Defendant]." (*Id.*) Additionally, Kahle argues that "the alleged communication did not reach the public. In fact, the only people who have any knowledge of the allegations are current and former employees of [Defendant]," and "[e]ven if Ms. Kahle said these things about the Counterclaimants, she did not publicize it in a way that would rise to a claim for false light invasion of privacy." (*Id.* at 14-15.)

In response, Counterclaimants argue that "Kahle disputes only the sufficiency of Counterclaimants' evidence . . . of 'Kahle's mental state' and that she gave publicity to the statements." (Doc. 55 at 14.) As for Kahle's mental state, Counterclaimants argue that "there is sufficient evidence that Kahle knowingly made false statements about Counterclaimants and/or made them with reckless disregard of the truth." (*Id.*) As for publicity, Counterclaimants argue that "[t]here is evidence of Kahle making false and defamatory statements about Bryant's 'secrets' and sex life at a popular restaurant in Seligman, Arizona within earshot of many patrons." (*Id.*) Further, Counterclaimants argue that "[t]here is evidence of Kahle making false and defamatory statements to numerous [Defendant] employees who are also [Defendant] customers," and "[t]hus, there is

sufficient evidence that Kahle communicated false information about Counterclaimants that was sure to become public knowledge." (*Id.* at 14-15.) Counterclaimants further argue that "even if this is insufficient to establish 'publicity,' summary judgment is still not warranted" because, according to the Restatement (Second) of Torts, "[w]hile cases to date allowing recovery for the type of invasion of privacy covered by this Section have been confined to the giving of publicity to the private matter, the courts may decide to extend the coverage to a simple disclosure." (*Id.* at 15, citing Restatement (Second) of Torts § 652D, cmt. (a) (1977).) Counterclaimants argue that (1) "[c]ourts have discretion to extend coverage of the publicity element when standards under § 652B are met"; and (2) "the requirements of § 652B have been satisfied"—and thus, "Counterclaimants need not demonstrate 'publicity' to defeat summary judgment." (*Id.* at 15-16, cleaned up.)

In reply, Kahle argues that "[a] statement is given publicity if it is made to a large audience," and "it is not enough to make a statement to a single person or even to a small group of persons." (Doc. 64 at 7, cleaned up.) Kahle argues that "[t]here is no evidence that the publicity requirement was met with any alleged statement." (*Id.*) Specifically, Kahle argues that "[e]ach of the statements involved small conversations, not a newspaper, magazine or large group of people." (*Id.* at 7-8.) Kahle also argues that "Counterclaimants suggest that other people were near the conversations and may have heard, but has not provided any evidence that this was the case, and even that would not satisfy the publicity requirement." (*Id.* at 8.)

2. <u>Analysis</u>

Under Arizona law, a false light invasion of privacy claim has two elements: "(1) the defendant, with knowledge of falsity or reckless disregard for the truth, gave publicity to information placing the plaintiff in a false light, and (2) the false light in which the plaintiff was placed would be highly offensive to a reasonable person in the plaintiff's position." *Desert Palm Surgical Grp., P.L.C. v. Petta*, 343 P.3d 438, 450 (Ariz. Ct. App. 2015). The parties dispute the "publicity" requirement of the first element.

"In the false light context, 'publicity' differs from the mere 'publishing' of a

defamatory statement." *Unknown Party v. Arizona Bd. of Regents*, 2019 WL 7282027, *17 (D. Ariz. 2019) (citation omitted). "Publicity requires that the matter is made public, by communicating it to the public at large, or to so many persons that a matter must be regarded substantially certain to become one of public knowledge." *Id.* (cleaned up). "Publicity requires more than communication to a single person or a small group of persons." *Id.* Rather, "wide-spread dissemination" is required. *Advanced Cardiac Specialists, Chartered v. Tri-City Cardiology Consultants, P.C.*, 214 P.3d 1024, 1028 n.7 (Ariz. Ct. App. 2009).

Counterclaimants have failed to raise a genuine dispute as to the publicity requirement. As an initial matter, it's not clear which statements provide the basis for Counterclaimants' false light claim. But even assuming Counterclaimants are relying on every allegedly defamatory statement identified in their opposition brief, Counterclaimants do not contend, nor does the record show, that any of these statements was "disclosed to the public at large, or to so many people that it is almost certain to become public." *Unknown Party*, 2019 WL 7282027 at *18. "Although Arizona courts have not provided much guidance concerning this requirement, the case law from other jurisdictions that apply the same rule makes clear that publication to a handful of people, as here, is not enough." *Id.* (collecting cases). For example, in *Leach v. Dist. Bd. of Trs. of Palm Beach*, 244 F. Supp. 3d 1334 (S.D. Fla. 2017), the court determined that publication to a class of "20 or more college students" was insufficient to satisfy the publicity requirement. *Id.* at 1341. Here, even construing the facts in the light most favorable to Counterclaimants, Counterclaimants have established that, at most, a small group of "current and former [Defendant] employees" heard Kahle's alleged statements. (Doc. 55 at 3-6.) This is insufficient. *See, e.g.*, *Luke v. City of Tacoma*, 2022 WL 2168938, *1 (9th Cir. 2022) ("Ake's alleged communication to Fiola and Cooper is a communication to a single person or a small group that does not qualify as publicity for the purposes of a false-light claim.") (cleaned up); *Unknown Party*, 2019 WL 7282027 at *18 (statement made "to a small group of officials involved in the university's disciplinary process . . . [did] not rise to the level

of public dissemination"); *Nelson v. Millenium Lab'ys, Inc.*, 2014 WL 11514329, *16 (D. Ariz. 2014) ("[T]hese statements to various Millennium employees cannot constitute 'publicity' for the purposes of a false light privacy action. No reasonable jury could find that these statements to various employees could be substantially certain to become subjects of public knowledge.") (cleaned up).

Also unavailing is Counterclaimants' argument that "[t]here is evidence of Kahle making false and defamatory statements about Bryant's 'secrets' and sex life at a popular restaurant in Seligman, Arizona within earshot of many patrons." (Doc. 55 at 14.) Even assuming this statement was made, and further assuming it was made "within earshot" of others at a restaurant, Counterclaimants have put forth no evidence that any of those unspecified restaurant patrons actually heard it. In *Wray v. Greenburg*, 646 F. Supp. 3d 1084 (D. Ariz. 2022), this Court encountered an analogous issue. There, Wray argued the publicity requirement was satisfied because Mark "had broadcast" a hyperlink with files to three individuals and the files in the hyperlink were "openly accessible by anyone with the link." *Id.* at 1115. The Court held that "[e]ven reading these allegations in the light most favorable to Wray, it [was] not reasonable to construe [the allegations] as alleging widespread dissemination . . . . [T]he hyperlink was disclosed in what appears to be a private email exchange between Jann-Michael and Stafford. Even assuming the link was public and thus theoretically accessible to anyone, there are no facts that suggest the link was *in fact* widely disseminated or placed in a location where anyone could access it. . . . *The mere possibility* that others *could have accessed* the Google drive does not satisfy the requirement that the matter be regarded substantially certain to become one of public knowledge." *Id.* (cleaned up, emphases added). Similarly, here, the mere possibility that others at the restaurant could have overheard the alleged statement(s) by Kahle is insufficient to meet the publicity requirement in the absence of evidence that any restaurant patron actually heard such statement(s).

Finally, the Court declines Counterclaimants' invitation to disregard the publicity requirement. Counterclaimants cite *Anthony v. United States*, 632 F. Supp. 3d 1017 (D.

Ariz. 2022), in support of their argument that courts have "discretion to extend coverage of the publicity element when standards under [Restatement (Second) of Torts] § 652B are met." (Doc. 55 at 16.) In *Anthony*, the court explained that "Arizona courts recognize the four-part classification of the tort of invasion of privacy under the Restatement (Second) of Torts . . . ." 632 F. Supp. 3d at 1037. "Those four classifications are invasion by (1) public disclosure of private facts; (2) intrusion upon seclusion; (3) false light; and (4) appropriation of another's name or likeness." *Id.* (citing Restatement (Second) of Torts § 652A). "The different types of classifications vary in degrees of tortious interference." *Id.* at 1037-38. The plaintiffs in *Anthony* brought a claim for public disclosure of private facts—that is, a claim under § 652D of the Restatement (Second) of Torts. *Id.* at 1037. That provision "provides for tort liability involving a judgment for damages for publicity given to true statements of fact." Restatement (Second) of Torts § 652D, special note.[24] The court held that the plaintiffs, on their public disclosure of private facts claim, had "made an insufficient showing of how Sloan publicized Plaintiffs' private affairs." *Anthony*, 632 F. Supp. 3d at 1038. However, the court stated that "the Restatement explains that a court has discretion to extend coverage of the publicity element when standards under § 652B are met"—i.e., where there has been an intrusion upon seclusion. *Id.* The court held that it was "undisputed that Sloan intruded on the Plaintiffs private matters under § 652B," and thus the court, "in its discretion, . . . extend[ed] coverage of the publicity element to include the lower standard for § 652B intrusion of seclusion." *Id.* at 1039.

Although Counterclaimants make the conclusory argument that "the requirements of § 652B have been satisfied" (Doc. 55 at 15), Counterclaimants have not argued, nor have they cited any evidence, that any of the information Kahle allegedly possessed was obtained via an intrusion (or any other tortious conduct). Thus, *Anthony* is inapposite.

Counterclaimants also emphasize comment (a) to § 652D, which provides:

---

24 In contrast, § 652E ("Publicity Placing Person in False Light") applies to "matter published concerning the plaintiff [that] is not true." Restatement (Second) of Torts § 652E, cmt. a. Sections 652D and 652E have the same publicity requirement. *Id.*, cmt. a ("On what constitutes publicity and the publicity of application to a simple disclosure, *see* § 652D, Comment *a*, which is applicable to the rule stated here.").

> *While the cases to date allowing recovery for the type of invasion of privacy covered by this Section have been confined to the giving of publicity to the private matter, the courts may decide to extend the coverage to a simple disclosure.* Under § 652B, prying and intruding into the private affairs and concerns of another may be actionable, and disclosure of the information so obtained will certainly add to the amount of damages. *It remains to be seen whether a disclosure not equivalent to the giving of publicity will be actionable when the obtaining of the information was not tortious in character.*

Restatement (Second) of Torts § 652D, cmt. a (emphases added).

To the extent Counterclaimants' argument is that the Court should, in its discretion, disregard the publicity requirement for a false light claim despite the absence of an intrusion or other tortious obtainment, the Court declines the invitation. *Cf. Ghassomians v. Ashland Indep. Sch. Dist.*, 55 F. Supp. 2d 675, 693 & n.13 (E.D. Ky. 1998) (applying the traditional publicity requirement that "a communication to a single person or small group of persons does not constitute publicity while publication to a crowd or through the mass media does," acknowledging that comment (a) to § 652(D) suggests that "all courts may not follow this route of thinking," and concluding that "[b]ecause there is no evidence that [the defendant] came across this information in a tortious manner, . . . the better rule is to define publicity as requiring wide dissemination"). The Court is also mindful that, as a federal court applying Arizona law, its role is not to push the boundaries of Arizona law in a manner that Arizona courts have declined to push them. *Unknown Party v. Arizona Bd. of Regents*, 2021 WL 1967392, *7 (D. Ariz. 2021) ("[T]his Court, as a federal court exercising supplemental jurisdiction over a state-law claim, is particularly ill-suited to the task of extending Arizona law in new and unprecedented ways."). Instead, "[t]he task of a federal court in a diversity action is to approximate state law as closely as possible in order to make sure that the vindication of the state right is without discrimination because of the federal forum." *Gee v. Tenneco, Inc.*, 615 F.2d 857, 861 (9th Cir. 1980). "The decisions of the state's intermediate appellate courts are data that a federal court must consider in undertaking this analysis." *Air-Sea Forwarders, Inc. v. Air Asia Co.*, 880 F.2d 176, 186 (9th Cir. 1989). In *Advanced Cardiac Specialists*, the Arizona Court of Appeals cited

comment (a) to § 652D and nevertheless concluded that "wide-spread dissemination" is required to satisfy the publicity requirement. 214 P.3d at 1029 n.7. This is a strong sign that the Court should decline Counterclaimants' invitation to break new ground here.

B. **Defamation**

1. The Parties' Arguments

Kahle argues that Counterclaimants cannot show defamation and/or defamation *per se* because she "did not say anything false" and all of her "alleged comments are about her personal opinions and at most would be considered hyperbole." (Doc. 47 at 9-10.) Kahle argues that, "[a]s a matter of law, a statement is not actionable if it is comprised of 'loose, figurative, or hyperbolic language' that cannot reasonably be interpreted as stating or implying facts 'susceptible of being proved true or false.'" (*Id.* at 10, citation omitted.) Kahle argues that she "expressed her opinions, rumors, working conditions, or safety concerns with former co-workers" and "did not make statements about [Counterclaimants] to any of its patrons" and that "Counterclaimants haven't produced any evidence to support a different conclusion." (*Id.*) Kahle also argues that "Counterclaimants rely on Ms. Schnelby and Ms. Robbins, current waitresses at [Defendant] and Ms. Kahle's former co-workers, to substantiate their defamation claims," "[y]et, Ms. Schnelby and Ms. Robbins tell a different story." (*Id.*) Next, Kahle argues that the statements she made "were during casual conversation between former coworkers regarding their worksite and management" and "[a] reasonable person would understand that conversations in this setting are full of loose, figurative, and hyperbolic language and are not to be taken literally. For example, using the phrase mob boss does not mean that [Kahle] meant that Counterclaimants were literally part of the mob." (*Id.* at 11.) Kahle also argues that alleged statements calling Bryant "mean," "pushy," and "unprofessional" are "merely opinions and Ms. Kahle's subjective impressions." (*Id.*) Kahle then argues that "a statement is not actionable as a matter of law when it does not present 'the kind of empirical question a fact-finder can resolve.'" (*Id.*, citation omitted.) Kahle argues that "[t]here isn't a single statement that Counterclaimants can point to in which is an assertion of fact that a factfinder can resolve."

(*Id.* at 12.) Next, Kahle argues that "none of the alleged statements made by Ms. Kahle injured [Counterclaimants] in the profession or imputed the commission of a crime," and thus none of the alleged statements are defamatory *per se*, and "[b]ecause none of the defamatory statements rise to the level of defamation per se, Counterclaimants are responsible for proving their damage" but "no damage has been provided." (*Id.* at 12-13.) Specifically, Kahle argues that she "has not received any calculation" of damages from Counterclaimants "and discovery has closed." (*Id.* at 13.) Moreover, Kahle argues that Bryant "stated that there is no loss of income to [Defendant] of any alleged defamation or false light" and that Bryant also "stated that her only damage was that she was upset." (*Id.*)

In response, Counterclaimants argue that "Kahle is not entitled to summary judgment because she made numerous false statements implying an assertion of objective fact, including but not limited to, stating Counterclaimants allowed her and/or their employees to be harassed, condone sexual harassment, were encouraging f*cking with Kahle, were 'mob boss[es]' telling [her] to drop the charges' against Helms, retaliated against her, 'terrorized [her]', were unethical, 'brought the torches', and were unprofessional." (Doc. 55 at 8-9.) Counterclaimants argue that "Kahle's statements may be objectively proven to be true or false. For example, Kahle cannot reasonably dispute a factfinder may resolve whether or not they told her to drop the charges against Helms, allowed her to be harassed, condoned sexual harassment, etc." (*Id.* at 9.) Next, Counterclaimants argue that "Kahle does not deny making any of the defamatory statements at issue" and merely "cites third-party testimony addressing only whether she made such statements directly to the deponent or simply claims, 'there is no evidence this statement was made.'" (*Id.*) Counterclaimants argue that "[t]his is insufficient to grant summary judgment" because Kahle should have "present[ed] an affidavit denying making statements." (*Id.* at 9-10.) Counterclaimants also argue that statements that defame Russell in turn defame Defendant's namesake, and thus, it is of no moment that some of Kahle's statements were directed at Russell, who is not a party to this matter. (*Id.* at 10.) Next, Counterclaimants argue that "Kahle cites no evidence supporting her claim that her

statements about Counterclaimants are true." (*Id.*) Rather, Counterclaimants argue that "Kahle admitted she doesn't know a 'mob boss' personally but has known/knew Bryant and Russell personally for a few years"; that Kahle "admits neither Russell nor Bryant demanded she drop the charges against Helms"; that "Bryant has never been connected to the mob or committed other crimes, terrorism, or ethical violations"; and that "Bryant was professional when interacting with Kahle." (*Id.*) Next, Counterclaimants argue that Kahle's statements were defamatory *per se*. (*Id.*) Specifically, Counterclaimants argue that "Kahle called Bryant as a 'whore' and 'slut' and claimed she slept with her employee's son though she never had sex for money, did not sleep with her employee's son, and is engaged to be married." (*Id.*) Counterclaimants also argue that "Kahle's statements that Bryant is 'incapable of running a business' . . . and is unprofessional in her business dealings and that Counterclaimants allowed Kahle and/or other employees to be harassed, condoned sexual harassment, and sided with its male over female employees are also defamatory per se because such statements impugn their business/profession." (*Id.* at 11.) Moreover, Counterclaimants argue that "referring to Counterclaimants as 'mob boss[es]' who told Kahle to drop the charges against Helms, persons who 'terrorized' her, and 'brought the torches' (to light her on fire) is defamatory per se because Kahle falsely accused them of being involved in organized crime, witness tampering, and terrorism, and arson, which are crimes." (*Id.*) Next, Counterclaimants argue that "Kahle cannot escape liability by simply claiming her defamatory statements are 'opinions'" because "Kahle's statements above assert false allegations about Counterclaimants as if they are objective facts" and "[l]abeling them as 'opinions' does not change this reality." (*Id.* at 11-12.) Counterclaimants also argue that "[t]here is sufficient evidence that Kahle knowingly made false statements" and that she "admits to referring to Bryant as a 'whore' and 'slut' because she was angry—not because she believed such allegations were true." (*Id.* at 12.) Counterclaimants contend that Kahle (1) "accused Counterclaimants of being 'mob boss[es]' who ordered her to drop charges against Helms"; and (2) "claimed [Defendant] condoned sexual harassment and allowed her and/or other employees to get harassed"—

and that Kahle knew both of these statements were false. (*Id.* at 12-13.) Counterclaimants also argue that "there are . . . factual disputes regarding Kahle making defamatory statements with reckless disregard of the truth and/or negligently. . . . For example, Kahle testified she knew it was just a 'bad' rumor that Bryant was sleeping with Sheri James' son, but she did not investigate whether the rumor was true before restating it to Robbins, Schnelby, and Helms." (*Id.* at 13.) Last, Counterclaimants argue that they "may pursue damages for pecuniary losses, emotional distress, shame, harm to reputation, injury to feelings, etc." and that they "have furnished sufficient evidence of [Defendant's] lost revenues, harm to Bryant's reputation, and Bryant's emotional distress caused by Kahle's defamatory statements." (*Id.* at 14.) Alternatively, Counterclaimants argue that "[t]hey need not present evidence of damages caused by Kahle's above referenced defamatory per se statements because they are presumed." (*Id.*)

In reply, Kahle argues that "Arizona law has consistently found that hyperbolic rhetoric or epithets (i.e., name-calling) are not defamatory as a matter of law," and "obscenities, vulgarities, insults, epithets, name-calling, and other forms of verbal abuse are insufficient to raise a claim for defamation." (Doc. 64 at 2, cleaned up.) Kahle also argues that "the intent and emotional state of the person making a statement should be considered, in addition to the understanding of a reasonable listener." (*Id.* at 3.) And Kahle reiterates that "loose, figurative, or hyperbolic language" is not defamatory because it "is not provable as either true or false." (*Id.*) Kahle argues that "Counterclaimants miss the mark on their analysis and fail to apply the appropriate context under which the statements were made, and instead they remove the context and analyze the statements literally in a way which no reasonable listener would have done." (*Id.* at 4.) Kahle also argues that "Counterclaimants acknowledge" that Kahle made her statements while she was "angry, meaning a reasonable listener would understand that statements were made to vent and based in emotion and not with intent to make a defamatory statement." (*Id.*) Kahle also emphasizes that "all of the alleged statements were made in communications among former coworkers concerning workplace conditions and treatment" and argues that "[f]ederal law

affirmatively protects such speech." (*Id.*) Next, Kahle reiterates that Counterclaimants "take each of the statements literally and out of context." (*Id.*) For example, Kahle argues that alleged statements that Counterclaimants were "mob boss[es]" who "terrorized" her and "brought the torches" would not be understood by a "reasonable listener" as "an accusation of arson, . . . involve[ment] in organized crime, or" that Counterclaimants are "terrorist[s] under the law." (*Id.* at 4-5.) Kahle also argues that "[a] similar analysis can be made to the alleged statements of 'whore' and 'slut,'" because "[a] reasonable listener in the circumstances these statement were made would understand that [Kahle] was not literally saying that Ms. Bryant worked as a prostitute" and that these were instead "vigorous epithet[s] and not to be reasonably understood as imply a fact." (*Id.* at 5.) And Kahle argues that the remaining alleged defamatory statements are "loose, figurative, or hyperbolic language." (*Id.* at 5-6.) Kahle also argues that "Counterclaimants' own witnesses concede that they did not believe Ms. Kahle's statements were intended to be factual, but instead were her opinion." (*Id.* at 6.) Next, Kahle argues that Counterclaimants have "improperly raised undisclosed statements at summary judgment." (*Id.*, cleaned up.) Specifically, Kahle argues that "Counterclaimants were specifically asked in discovery to identify, with particularity, each statement or implication by Ms. Kahle that they contend was false," and that Counterclaimants "provided both an initial and an amended response," but "[d]espite that disclosure, Counterclaimants' opposition now relies on alleged statements that do not appear in either the initial or amended interrogatory responses, including references such as 'they're f**cking encouraging f**ckin with me,' 'f*cked [her] over and terrorized [her],' 'mob boss[es] telling [her] to drop the charges,' and assertions of 'retaliation.'" (*Id.* at 6-7.) Kahle argues that "[t]hese are new alleged statements raised for the first time in opposition to summary judgment" and "[t]hat is improper." (*Id.* at 7.) Last, Kahle argues that Rule 26(a)(1)(A)(iii) requires "a computation of each category of damages claimed" and that Counterclaimants have failed to comply with that requirement. (*Id.* at 8.)

…

2. Analysis

"Arizona follows the Restatement (Second) of Torts (1977) . . . on claims relating to defamation of a private person." *Desert Palm Surgical Grp.*, 343 P.3d at 449. Under the Second Restatement, "[t]o create liability for defamation there must be: (a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm [*i.e.*, defamation *per se*] or the existence of special harm caused by the publication [*i.e.*, defamation *per quod*]." Restatement (Second) of Torts § 558 (1977).

a. **Allegedly Defamatory Statements Raised For The First Time At Summary Judgment**

Counterclaimants' defamation claim has been a moving target, and Counterclaimants' briefing fails to clarify which statements they contend are defamatory. (*See, e.g.*, Doc. 55 at 8-9, emphasis added ["Kahle is not entitled to summary judgment because she made numerous false statements implying an assertion of objective fact, *including but not limited to* . . . ."].) This approach is improper, particularly in a defamation case, because "[a] claim for defamation requires identifying a specific defaming statement," *Stone v. Charles Schwab & Co. Inc.*, 2025 WL 2829563, *8 (D. Ariz. 2025), and determining whether an allegedly defamatory statement is non-actionable opinion requires an "examin[ation] [of] the totality of the circumstances in which it was made," *Underwager v. Channel 9 Australia*, 69 F.3d 361, 366 (9th Cir. 1995).

On a related note, Kahle argues in her reply brief that "Counterclaimants' opposition now relies on alleged statements that do not appear in either the initial or amended interrogatory responses, including references such as 'they're f**cking encouraging f*ckin with me,' 'f*cked [her] over and terrorized [her],' 'mob boss[es] telling [her] to drop the charges,' and assertions of 'retaliation.'" (Doc. 64 at 6-7.) The Court agrees that the following allegedly defamatory statements are raised by Counterclaimants for the first time at summary judgment:

- "they're f*cking encouraging f*ckin with me"
- "f*ucked [her] over and terrorized [her]"
- Assertions of "retaliation"

None of these statements were alleged as the basis for Counterclaimants' defamation counterclaim. (Doc. 4 at 12-19.) These allegedly defamatory statements were also not identified by Counterclaimants in response to Kahle's First Set of Interrogatories. (Doc. 47-2 at 32-34, 38-43.) Interrogatory 3 specifically sought the following:

> Describe in full and complete detail any statements or implications Ms. Kahle made about Counterclaimants that were false or placed Counterclaimants in false light, including: (a) The content of the statements . . . .

(*Id.* at 32.) Thus, Counterclaimants are seeking to raise these allegedly defamatory statements for the first time in their response to Kahle's motion for summary judgment. This is improper for the reasons stated elsewhere in this order. *Navajo Nation*, 535 F.3d at 1079-80; *Chaffin*, 2025 WL 522518 at *4-5; *Capuano*, 2012 WL 2376675 at *1. *See also Abdulhussain v. MV Pub. Transportation Inc.*, 2025 WL 2257513, *3-4 (D. Ariz. 2025) (disallowing plaintiff's attempt, in response to summary judgment motion, to identify new defamatory statements beyond those alleged in the complaint and disclosed during discovery).[25]

b. **Non-Actionable Opinion**

"Although defamation is primarily governed by state law, the First Amendment safeguards for freedom of speech and press limit state law." *Underwager*, 69 F.3d at 366. "The scope of constitutional protection extends to statements of opinion on matters of public concern that do not contain or imply a provable factual assertion." *Id.* "To determine whether a statement implies a factual assertion, we examine the totality of the circumstances in which it was made." *Id.* "First, we look at the statement in its broad

[25] In contrast, the Court concludes that the alleged statement referring to Counterclaimants as "mob boss[es] telling [her] to drop the charges" was at least arguably raised in Counterclaimants' amended interrogatory responses. Accordingly, the Court will address the merits of this statement below.

context, which includes the general tenor of the entire work, the subject of the statements, the setting, and the format of the work. Next we turn to the specific context and content of the statements, analyzing the extent of figurative or hyperbolic language used and the reasonable expectations of the audience in that particular situation. Finally, we inquire whether the statement itself is sufficiently factual to be susceptible of being proved true or false." *Id.* *See also Unelko Corp. v. Rooney*, 912 F.2d 1049, 1053 (9th Cir. 1990). "Even in contexts in which the general tenor of the work suggests that the author is expressing personal opinions, it is possible that a particular statement of opinion may imply a false assertion of objective fact and therefore fall outside the scope of the First Amendment's protection . . . ." *Partington v. Bugliosi*, 56 F.3d 1147, 1155 (9th Cir. 1995). "The courts of appeals that have considered defamation claims . . . have consistently held that when a speaker outlines the factual basis for his conclusion, his statement is protected by the First Amendment." *Id.* at 1156.

Here, all of the allegedly defamatory statements appear to have been made in private conversations between Kahle and a handful of current and/or former co-workers, at a time when emotions were running high because Kahle had just been terminated by Defendant. Therefore, as an overarching matter, the general context in these statements were made suggests they would be interpreted as opinions and not statements of objective fact. In other words, the "general tenor" suggests that these were not statements of fact. With that in mind, the Court turns to whether each statement (1) uses figurative and/or hyperbolic language; and (2) can be proved true or false.

#### c. Allowed Their Employees To Be Harassed / Allowed Helms To Harass Her And Was Suing Because She "Heard [She] Could Get Up To $50,000" / Allowed Helms to Harass and Victimize Her / Sided With Helms Over Her

Counterclaimants argue that "Kahle told multiple people, including current and former [Defendant] employees that Bryant, Russell, and/or [Defendant] allowed their employees to be harassed." (Doc. 55 at 3.) Counterclaimants also argue that "Kahle stated Bryant, Russell, and/or [Defendant] allowed Helms to harass her and 'sided with [Helms]'"

and that "Kahle made similar statements to former [Defendant] employees Chanel James and Dean Leone." (*Id.*)[26]

As an initial matter, to the extent Counterclaimants' argument is that Kahle's alleged statement that she was suing because she "heard [she] could get up to $50,000" is defamatory (Doc. 47-2 at 39), that argument is without merit because the alleged statement doesn't say anything about Counterclaimants—it simply states why Kahle brought her lawsuit. "To be actionable as a matter of law, defamatory statements must be published in such a manner that they reasonably relate to specific individuals. . . . [T]he burden rests on the plaintiff to show that the publication was of and concerning him." *Hansell v. Stoll*, 636 P.2d 1236, 1240 (Ariz. Ct. App. 1981) (cleaned up).

As for Kahle's alleged statements that Counterclaimants "allowed their employees to be harassed" (Doc. 55 at 3) and "allowed Ethan Helms to harass/victimize [Kahle]" (Doc. 47-2 at 39, 40), liability could only attach if Kahle, in fact, made the statements at issue. *Kruska v. Perverted Justice Found. Incorporated.Org*, 2011 WL 1260224, *3 (D. Ariz. 2011) ("[F]or a statement to be defamatory, the allegedly defamatory statement must have actually been made."). However, none of the exhibits cited by Counterclaimants shows that these statements were made by Kahle. For example, in Bryant's deposition, nowhere does Bryant say that she personally heard Kahle make such a statement or that someone else told her that Kahle stated that Counterclaimants "allowed harassment." (Doc. 55-1 at 22-23.) In James's deposition, the following exchange occurred:

> Q. Has [Kahle] ever made any statements about the café condoning sexual harassment?
>
> A. I don't know that it would be a statement. It's just things that have happened. I don't know. I don't know how to confidently answer that. Kind of, I guess.
>
> Q. *And, to clarify,* I'm not using the word statement as a formal

---

[26] Counterclaimants' amended response to Interrogatory No. 3 similarly provides that: (1) "Plaintiff stated that [Counterclaimants] allowed Ethan Helms to harass her and she was suing because she 'heard [she] could get up to $50,0000'"; and (2) "Plaintiff stated that [Counterclaimants] allowed Ethan Helms to harass/victimize her and sided with Ethan Helms over her." (Doc. 47-2 at 39, 40.)

declaration for example. My question is has she ever had any kind of discussions with you in which she communicated that she believed that the café condoned sexual harassment?

A. *No.*

(Doc. 55-6 at 3-4, emphases added.) And in Schnelby's deposition, Schnelby stated "no" when asked whether Kahle had "every [sic] said to you that counter – that [Russell], [Bryant], or the café allowed employees to be harassed." (Doc. 47-2 at 53.)[27]

Robbins's deposition presents a slightly closer call. Robbins testified as follows:

Q. Did [Kahle] ever say something like [Bryant] and [Russell] let their employees be harassed?

A. I think she might have actually, if I remember correctly.

Q. Okay. So what do you remember about that?

A. I don't know. She just didn't agree with it. I think yeah, she didn't agree with it.

(Doc. 55-5 at 5.) Counsel then questioned Robbins about what she meant by "didn't agree with it," and Robbins asked for the question to be repeated. (*Id.*) But this exchange does not show that Kahle actually stated "[Bryant] and [Russell] let their employees be harassed." Counsel asked Robbins if Kahle had ever "sa[id] something *like*" that, and when asked to elaborate, Robbins stated that Kahle "just didn't agree with it" (i.e., didn't agree with Counterclaimants' handling of Helms's alleged harassment).

In any case, this exchange reflects, at the very most, that Kahle expressed her *opinion* to Robbins that she did not agree with Counterclaimants' handling of the alleged harassment against her, not that Kahle stated that Counterclaimants "allow harassment."

---

27 Counterclaimants argue that it is not enough for Kahle to argue that the record has no evidence that this statement was made; she instead must come forth with an affidavit denying that the statement was made. (Doc. 55 at 9-10.) Counterclaimants are incorrect. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out that there is an absence of evidence to support the nonmoving party's case.") (cleaned up); 2 Gensler, Federal Rules of Civil Procedure, Rules and Commentary, § 56:34 (June 2026 update) ("[A]ll courts agree—and this was the critical point of *Celotex*—that the moving party's only burden is to address the existing proof record and in some measure identify some hole in that proof. The moving party need go no further, and in particular is not obligated to submit new proof showing that there is nothing missing that could fill that hole.")

*Cf. Underwager*, 69 F.3d at 367 ("[W]hen asked if Underwager was intrinsically evil, Oates replied, 'I don't know. I mean I guess, I believe he's wrong.' This expressed Oates's belief, not a generally truth."). Also in Robbins's deposition, the following exchange occurred:

> Q. Okay. So what did she say? What did she say along those lines?
>
> A. *Feels like*—for me, the only thing I can go to is the [Helms] situation is that *she felt that they allowed her to be harassed with him.*
>
> . . .
>
> Q. And she said that [Russell] and [Bryant] allowed [Helms] to harass her? What did she say about that?
>
> A. She just said she *didn't feel like they*—what was the words? *Like they sided with him in a sense.*
>
> Q. So they didn't protect her from harassment, is that what you mean?
>
> A. That's what she –
>
> [objection omitted]
>
> A. She was saying that, yeah, back at that time. *She didn't feel like they*—yeah, they did proper whatever the words.

(Doc. 55 at 9.) Again, at the very most, this exchange reflects that Kahle expressed her opinion to Robbins that she *felt* that Counterclaimants had sided with Helms, not that Kahle actually stated that Counterclaimants "allow harassment." Counterclaimants do not dispute that Kahle disagreed with their handling of the alleged harassment, nor do they dispute that Kahle *felt* like they sided with Helms—accordingly, these statements are not defamatory. *McReady v. O'Malley*, 804 F. Supp. 2d 427, 442 (D. Md. 2011), *aff'd*, 468 F. App'x 391 (4th Cir. 2012) ("With respect to Dr. Reed's statements that she felt harassed and threatened by Dr. McReady's conduct, there is simply no genuine dispute that Dr. Reed *in fact* felt that way.").

Alternatively, even if Kahle did state that Counterclaimants "allow harassment" or that Counterclaimants "sided with" Helms, such statements still would not be defamatory. As an initial matter, several courts have held that simply accusing another of "harassment" or being a "harasser" does not amount to defamation. *See, e.g.*, *Coleman v. Grand*, 158

F.4th 132, 141 (2d Cir. 2025) ("[S]ome New York courts have determined that allegations of harassment are not defamatory because of the imprecision of the term."); *Mehdizadeh v. Starbucks Corp.*, 2024 WL 4803735, *6 (E.D. Pa. 2024) ("shift supervisor's accusations that [Mehdizadeh] harassed and disrespected his colleagues" not actionable because "it is well-settled that derogatory characterizations without more are not defamatory") (cleaned up). In *Hartzell v. Marana Unified Sch. Dist.*, 130 F.4th 722 (9th Cir. 2025), Hartzell brought a defamation claim under Arizona law against Divijak based on "two documents allegedly sent to [Hartzell's] employer." *Id.* at 745. The second document was "a typed, unsigned, one-paragraph note stating that Hartzell had been using her university email account to 'harass, bully, intimidate[,] and threaten people." *Id.* at 747. The Ninth Circuit agreed with Divijak and the district court that "at least in this context, the words 'harass,' 'bully,' 'intimidate,' and 'threaten' cannot be actionable because they 'merely describe how the author of the Second Document interpreted Plaintiff's communications." *Id.* The Ninth Circuit noted that "Arizona courts have considered dictionary definitions to determine whether certain statements were actionable," and it further held that "[e]ach of the terms used here has at least one definition that reflects a subjective opinion or belief rather than an objective, provable fact." *Id.* Although the court "express[ed] no view on whether these words could be actionable in another context, such as where the plaintiff is accused of engaging in sexual harassment or making criminal threats," the court held that "[n]othing in the second document suggests that 'bully,' 'harass,' 'intimidate,' or 'threaten,' is being used to do anything more than describe the author's subjective reaction to Hartzell's e-mails" and that terms such as "harass" have a "typically subjective meaning." *Id.* at 747-48 & n.13. Although Defendant has been accused by Kahle in this matter of failing to remedy sexual harassment by Helms, as discussed above, Robbins's testimony *at most* describes Kahle expressing her subjective opinion about how Counterclaimants handled what she perceived to be "harassment." *Cf. Byrnes v. Lockheed-Martin, Inc.*, 2005 WL 3555701, *7 (N.D. Cal. 2005), *aff'd and remanded sub nom.*, 257 F. App'x 34 (9th Cir. 2007) ("In any event, these alleged statements—that Byrnes was a

'sex harasser,' a 'dangerous harasser,' an 'unstable person,' a 'menace,' and 'a danger to other employees'—are couched in defendants' own perceptions and therefore opinions rather than statements of fact. Defendants are entitled to summary judgment on Byrnes' defamation claims.").

In sum, no reasonable juror could conclude that Kahle's statements amounted to anything more than her opinion that (1) she disagreed with Counterclaimants' handling of the situation with Helms; and/or (2) she *felt* that Counterclaimants allowed her to be harassed and that they sided with Helms.

d. **Mean, Pushy, Unprofessional**

Counterclaimants argue that "Kahle told Robbins that '[Bryant] and [Russell] were mean, pushy in a sense . . . not professional.'" (Doc. 55 at 3.)

As an initial matter, it does not appear that Counterclaimants have come forth with evidence that Kahle told Robbins that Bryant and Rusell were "mean" and "pushy." The only evidence cited by Counterclaimants in support of this statement having been made is Robbins's deposition, in which Robbins testified that Kahle "had stated that [Bryant] and [Russell] were mean, pushy in a sense, *not verbatim words mind you*. I don't remember exact words." (Doc. 55-5 at 4, emphasis added.)[28] Regardless, referring to someone as "mean," "pushy," or "unprofessional" is not defamatory. *See, e.g.*, *Hernandez v. Scottsdale Hotel Grp. LLC*, 2020 WL 6827745, *3 (D. Ariz. 2020) (statement that the plaintiff's email was "rude," "disrespectful," and "threatening" was non-actionable opinion); *Hunley v. Orbital Scis. Corp.*, 2006 WL 2460631, *3 (D. Ariz. 2006) (citing cases holding that references to another person as "unprofessional," "abusive," and "rude" are nonactionable opinions); *Glaze v. Marcus*, 729 P.2d 342, 344 (Ariz. Ct. App. 1986) (referring to the plaintiff as "unprofessional, insubordinate and abusive" is "pure opinion").

…

…

[28] In contrast, Robbins did testify that Kahle called Bryant "unprofessional." (Doc. 55-5 at 7-8.)

e. **"Sides With Men Over Women" / "If Something Goes Wrong, [Defendant] Won't Side With You, So Be Careful When You're There"**

Counterclaimants argue that "Kahle told third parties that [Defendant] 'sides with men over women'" and told Laura Boyd "if something goes wrong, [Defendant] won't side with you, so be careful when you're there." (Doc. 55 at 4.) In support, Counterclaimants cite the following testimony from Kahle's deposition:

Q. Have you told anyone that the café sides with men over women, for example?

A. Rough—loosely, yes.

Q. Tell me what you said and to whom.

A. It was – a young girl I worked with was being stalked by her man, and he was saying crazy shit just like [Helms], and she would clean the floors at [the café]. And so she was referencing that she was going to get a protective order against him. And I told her—like, right as she was saying it, she said, you know, "Because I'm alone at night when I clean the floors." And I gasped because it had hit me that she was there alone at night and he was being weird and threatening. And he is also, like, entrenched with the, like, [Russell's] family. Well, I guess that doesn't make sense. Entrenched with like—he's—he matters to them. So when she said, "I'm alone at night," I said, "Oh, yeah." I gasped, and I was like, "Okay. *In my experience, if something goes wrong, they won't side with you, so be careful when you're there*." And she didn't ask me anything else. She just nodded her head.

(Doc. 55-3 at 25-26, emphasis added.)

This statement is not defamatory for two reasons. First, no reasonable juror could conclude that the statement "*[i]n my experience*, if something goes wrong, they won't side with you" is anything more than a statement of opinion by Kahle about her past experiences. Second, the statement does not imply an underlying statement of fact. At most, the statement implies that Counterclaimants did not "side with" Kahle in the past—but what it means to "side with" someone is subjective. Merriam-Webster defines "side with" as "to agree with or support the opinions or actions of (someone)." *Side With*,

Merriam Webster (last accessed August 26, 2026), https://www.merriam-webster.com/dictionary/side%20with [https://perma.cc/YL5R-Q2MR]. There are "no objective criteria that a jury could effectively employ to determine the accuracy" of whether Counterclaimants "side with" men over women. *Oakes v. Gannett Media Corp.*, 2025 WL 3254982, *6 (D. Ariz. 2025) (quoting *Turner v. Devlin*, 848 P.2d 286, 292 (Ariz. 1993)).

f. **Had Sex With Someone's Son**

Counterclaimants argue that "Kahle told Robbins, . . . Schnelby, and Helms that Bryant had sex with Sheri James's, a [Defendant] employee, son." (Doc. 55 at 4.) Counterclaimants argue this was a "rumor" that Kahle heard and then repeated. (*Id.*) And Counterclaimants argue the rumor is not true because "Bryant did not have sex with" the son. (*Id.*) Kahle does not appear to dispute that she repeated this "rumor" to others—indeed, that appears to be her defense as it relates to this particular statement. (Doc. 47 at 6 ["Ms. Schnelby stated that Ms. Kahle was repeating a rumor when she said that Ms. Bryant was sleeping with somebody's son."]; *id.* at 10 ["Kahle expressed . . . rumors . . . with former coworkers."].)

That Kahle was merely repeating a rumor does not insulate her from liability for defamation. Section 578 of the Restatement (Second) of Torts provides that "[e]xcept as to those who only deliver or transmit defamation published by a third person, one who repeats or otherwise republishes defamatory matter is subject to liability as if he had originally published it." Comment (c) to § 578 further provides:

> [O]ne who repeats a slanderous statement originally published by a third person is subject to liability to the person defamed as though he had himself originated the statement. This is true although the speaker accompanies the slander with a statement that it is a rumor only, or designates the name of the author or the original publisher. The rule stated is applicable although the person to whom the slander is repeated has already heard similar statements from other sources, although that fact is to be taken into account in determining the damages recoverable for the harm to the reputation of the person defamed.

The Restatement also provides several illustrations, including:

> A states to B that C has just told him that D, an unmarried woman, has given birth to a baby. A is subject to liability to C.

*Id.* Accordingly, Kahle's repetition of this "rumor" may qualify as actionable defamation.

Additionally, because Counterclaimants have come forth with evidence that "Bryant has been in a committed, monogamous relationship with her fiancé, Dean Kiel, for almost six years" (Doc. 55 at 4, citing Doc. 55-2 at 6 ¶ 45), and it seems that this "rumor" was repeated by Kahle sometime after she was terminated in May 2023 (Doc. 47 at 4, 6; Doc. 55 at 4), this "rumor" accuses Bryant of cheating on her fiancé and thus "imputes serious sexual misconduct" to Bryant. As a result, it constitutes defamation *per se* such that "proof of special harm" is not required. Restatement (Second) of Torts § 574 & cmt. (b) (1977) ("The rule in this Section has been generally applied to any statement that imputes any form of unchastity to a woman . . . . The rule applies to a statement charging a woman with specific acts of adultery, fornication or any other form of sexual intercourse with a man other than her husband, as well as to general charges of unchaste conduct."). For that reason, Kahle's arguments regarding the lack of disclosed damages are without merit, as least as they relate to this particular statement.

Finally, to the extent Kahle argues for the first time in her reply brief that any statement made to co-workers concerning workplace conditions and treatment is "legally protected" (Doc. 64 at 4), that argument is forfeited. *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief."). Nor is it apparent to the Court how Kahle's repetition of a rumor about Bryant's alleged sexual activity with a non-employee (albeit an employee's son) could qualify as a statement about workplace conditions and treatment.

g. **Has Secrets That People Don't Know**

Counterclaimants argue that Kahle "said Bryant 'has secrets that people don't know.'" (Doc. 55 at 4.) But "[s]tatements to the effect plaintiffs have a secret is not itself defamatory . . . ." *Harvey v. Cable News Network, Inc.*, 48 F.4th 257, 272 (4th Cir. 2022).

…

h. **Doesn't Know How To Run A Business Properly / "Didn't Have Her Ducks In A Row"**

Counterclaimants argue that Kahle stated that Bryant was "incapable of running a business." (Doc. 55 at 3. *See also* Doc. 47-2 at 39 ["Plaintiff stated that Bryant . . . didn't know how to run a business properly; and that she 'didn't have her ducks in a row.'"].) Counterclaimants argue that this statement is defamatory per se "because such statements impugn their business/profession." (Doc. 55 at 11.)

"Many courts have been reluctant to deny First Amendment protection to subjective personal assessments or criticisms of work performance on the grounds that such statements are simply not susceptible of being verified as true or false." *Prostrollo v. Scottsdale Healthcare Hosps.*, 2018 WL 501414, *6 (D. Ariz. 2018). Kahle's statement that Bryant "was incapable of running a business" cannot be objectively verified because reasonable minds may differ as to what it means to "run a business." *Cf. Partington*, 56 F.3d at 1155, 1157-58 (where plaintiff argued that a statement was "defamatory because it implie[d] that he did not read the transcripts and that he therefore did not adequately represent his client," the court held that "assessments of a lawyer's trial performance are inherently subjective and therefore not susceptible of being proved true or false" and that "[r]easonable minds can and do differ as to what strategy should be adopted in a trial"). *See also Hinchey v. Horne*, 2013 WL 4543994, *10 n.4 (D. Ariz. 2013) ("Defendants also make this argument with respect to Horne and Bistrow's statements that Plaintiff is 'hard to work with,' a 'rogue investigator,' and 'incompetent,' but the Court has already found that Plaintiff cannot base her defamation claim on these non-fact-based expressions of opinion."); *Glaze*, 729 P.2d at 344 (referring to plaintiff as unprofessional, insubordinate, and abusive was non-actionable opinion).[29]

[29] To the extent the allegedly defamatory statement was that Bryant "didn't know how to run a business *properly*" (Doc. 47-2 at 39, emphasis added), such a statement is even less capable of objective verification because reasonable minds would certainly differ as to what it means to run a business "properly." Likewise, to the extent the allegedly defamatory statement was that Bryant "didn't have her ducks in a row" (*id.*), that is a metaphorical and hyperbolic expression of opinion that cannot be objectively verified.

**i. Russell Is "Evil" And "[Had] A Dark Side To Her"**

In her summary judgment motion, Kahle contends that two of the underlying statements giving rise to Counterclaimants' defamation counterclaim are that (1) she referred to Russell as "evil" and (2) she stated that Russell "[had] a dark side to her." (Doc. 47 at 6-7.) Counterclaimants, in turn, seem to confirm (via a cross-reference to Kahle's motion) that their defamation counterclaim is, in fact, based on these two alleged statements. (Doc. 55 at 4.) Although Counterclaimants fail to cite evidence in their opposition brief supporting that these statements were made, they do attach, as Exhibit H, an excerpted copy of Schnelby's deposition in which Schnelby testified that, at the RoadRunner café, Kahle "was saying that [Russell] has a different side to her and she's evil." (Doc. 55-7 at 4.)

Even assuming Counterclaimants have raised a genuine dispute about whether these statements were made, they are not defamatory. Saying that someone has "another side to them" or a "dark side" is subjective and cannot be proved true or false. Put differently, there are "no objective criteria that a jury could effectively employ to determine the accuracy" of Russell's having a "dark side." *Oakes*, 2025 WL 3254982 at *6 (citation omitted). Similarly, Kahle's alleged "characterization of [Russell] as 'evil' is not a verifiable statement of fact." *Boley v. Atl. Monthly Grp.*, 950 F. Supp. 2d 249, 260 (D.D.C. 2013). *See also Underwager*, 69 F.3d at 367 ("[E]ven if Oates had agreed that Underwager was intrinsically evil, such an assertion is not capable of verification.").[30]

**j. "Do Not Defend Those Evil, Greedy Unhinged Despotic Cunts To Me Either"**

"As a matter of law, a statement is not actionable if it is comprised of 'loose, figurative, or hyperbolic language' that cannot reasonably be interpreted as stating or implying facts 'susceptible of being proved true or false.'" *Takieh*, 497 P.3d at 1006 (citation omitted). Moreover, "obscenities, vulgarities, insults, epithets, name-calling, and

---

[30] Because this statement is not defamatory, it is unnecessary to address Kahle's argument that this statement is non-actionable because it refers to Russell, a non-party.

other forms of verbal abuse are insufficient to raise a claim for defamation." *Foroughi v. Wal-Mart Stores, Inc.*, 2010 WL 2231931, *2 (D. Ariz. 2010). *See also Flowers v. Carville*, 310 F.3d 1118, 1127 (9th Cir. 2002) ("The law provides no redress for harsh name-calling.").

In *Breeser v. Menta Grp., Inc., NFP*, 934 F. Supp. 2d 1150 (D. Ariz. 2013), *aff'd sub nom.*, 622 F. App'x 649 (9th Cir. 2015), one of the statements at issue was Hubble's statement that Breeser was a "bitch." *Id.* at 1162. The court held that was "clearly an opinion expressed by Hubble." *Id.* The court noted that "[t]he statement was allegedly made after Breeser was fired in April 2009." *Id.* Similarly, Kahle's statements were made after she was fired by Defendant. Her alleged name-calling of Counterclaimants as "evil, greedy unhinged despotic cunts" is nothing more than a "harsh moniker that [Kahle] used to describe" Counterclaimants and is thus "clearly an opinion." *Id.*

Furthermore, as discussed above, referring to someone as "evil" does not constitute defamation because a characterization of someone as "evil" is not objectively verifiable. *Underwager*, 69 F.3d at 367; *Boley*, 950 F. Supp. 2d at 260. Similarly, characterizing someone as "greedy," "unhinged," and "despotic" is not objectively verifiable. *See, e.g.*, *Harris v. Warner in & for Cnty. of Maricopa*, 527 P.3d 314, 319 (Ariz. 2023) (statement referring to someone as "unhinged" was "not actionable" because it was "not [a] statement[] or implication[] of objective fact"); *Fetter v. N. Am. Alcohols, Inc.*, 2007 WL 551512, *12 (E.D. Pa. 2007) ("Stephen Reiser's statements are not capable of a defamatory meaning. The alleged statements to the effect that the plaintiff was greedy, unreasonable, or foolish reflect personal opinion and therefore do not constitute defamation."); *Horrell v. Merrill Lynch, Pierce, Fenner, & Smith Inc.*, 2006 WL 2735448, *6 (N.D. Ill. 2006) ("[A] vague statement that one is a crook or greedy is not defamatory because such assertions are merely opinions that lack verifiable facts."); *Metcalf v. KFOR-TV, Inc.*, 828 F. Supp. 1515, 1530 (W.D. Okla. 1992) ("Whether or not something is a 'sham' and a doctor or doctors are 'greedy' are matters of opinion."); *Perruccio v. Arseneault*, 508 A.2d 831, 834 (Conn. Ct. App. 1986) ("dictator leadership" not defamatory because it "may properly be

characterized as opinion because it is not objectively capable of being proven true or false").

Nor is use of the term "cunt" a statement of fact in this context. *See, e.g.*, *Cox v. Red Hat, Inc.*, 2024 WL 98162, *6 (E.D. Va. 2024) ("Marcey calling Plaintiff a 'cunt' cannot reasonably be understood to convey a false representation of fact. Marcey's use of this epithet merely evinces his general animosity towards Plaintiff and thus does not amount to an actionable statement.") (cleaned up); *LaNasa*, 2025 WL 893456 at *3 (calling someone an "ignorant c*nt" was a "non-actionable epithet[]" that "could not support a claim of defamation per se"). As a result, Kahle's alleged reference to Counterclaimants as "evil, greedy unhinged despotic cunts" is nothing more than "harsh name-calling" for which "[t]he law provides no redress." *Flowers*, 310 F.3d at 1127.

k. **"They Did Their Fucking Mob Boss Shit" / Told Kahle To Drop Charges**

Counterclaimants argue that "Kahle referred to Bryant and Russell as 'mob boss[es],' claiming they told her to drop the charges against Helms." (Doc. 55 at 5.) Counterclaimants argue that this statement was defamatory *per se* and that "Bryant has not ever been connected to the mob or committed other crimes, terrorism, or ethical violations." (*Id.* at 9-10.) This allegedly defamatory statement is found in a text message exchange between Kahle and Helms. (Doc. 55-3 at 60.) The text message from Kahle reads: "Yeah she said that then they did their fuckin mob boss shit telling me to drop charges." (*Id.*)

As for the first part of this statement, which refers to Counterclaimants' behavior as "mob boss shit," that is classic "loose, figurative, [and] hyperbolic language that cannot reasonably be interpreted as stating or implying facts susceptible of being proved true or false." *Takieh*, 497 P.3d at 1006 (internal quotations and citation omitted). Kahle did not state or even imply that Counterclaimants have ties to the mob or are involved in organized crime—and no reasonable reader would think that is what was being stated or implied. Referring to Counterclaimants' behavior as "mob boss shit" also cannot be objectively

verified because there are no "objective criteria" by which one could determine whether Counterclaimant's behavior was, in fact, "mob boss shit." *Oakes*, 2025 WL 3254982 at *6. And even if Kahle's use of the term "mob boss shit" was intended to imply that Kahle perceived Counterclaimants' behavior as threatening, that also would not be defamatory because Plaintiff nowhere states or even implies that Counterclaimants actually threatened her. *See, e.g.*, *Hernandez*, 2020 WL 6827745 at *3 (description of email as "threatening" was not defamatory because it "amount[ed] to an opinion statement" that "expresse[d] a personal impression of the email" and did "not suggest that Plaintiff actually made a threat, but rather that Schwanz perceived the email to be 'threatening'"); *Turner*, 848 P.2d at 292-93 (referring to manner of police conduct as "border[ing] on police brutality" was "plainly" based on a "personal impression," and "did not accuse Turner of physical abuse or brutality" but "[i]nstead . . . *characterized* his *manner* as *bordering* on police brutality"). The "subjective nature" of Kahle's characterization of Counterclaimants' behavior and her use of "analogy" indicates that her statement was nothing more than a statement of opinion expressing her perception of Counterclaimants' behavior. *Turner*, 848 P.2d at 292.

As for the second part of Kahle's statement—i.e., Counterclaimants told her to drop the charges against Helms—such a statement, even if false, is not defamatory. Saying that Counterclaimants told her to drop the charges against Helms does not bring Counterclaimants "into disrepute, contempt, or ridicule, or . . . impeach [their] honesty, integrity, virtue, or reputation." *Harris*, 527 P.3d at 320 (cleaned up). There is nothing inherently defamatory about asking Kahle to drop the charges against Helms. *Cf. Oakes*, 2025 WL 3254982 at *7 ("Statements that plaintiff did not show up to Thanksgiving dinner and did not call, or that plaintiff was gaining weight, could not have harmed plaintiff's reputation in an actionable manner."). And again, even if Kahle *perceived* the manner in which Counterclaimants told her to drop the charges as threatening (i.e., by referring to their behavior as "mob boss shit"), nowhere in these text exchanges does Kahle state or imply that Counterclaimants *actually threatened her* to drop the charges. *Hernandez*, 2020 WL 6827745 at *3; *Turner*, 848 P.2d at 292-93.

l. **"[Bryant] Brought the Torches"**

Counterclaimants argue that "Kahle claimed Bryant 'brought the torches' after she 'poured gas all over her life.'" (Doc. 55 at 5.) Counterclaimants argue this statement is defamatory per se because it "falsely accused them of being involved in . . . arson, which [is a] crime[]." (*Id.* at 11.)

No reasonable juror could conclude that Kahle's statement that "[Bryant] brought the torches" was intended to be taken literally or that Kahle was accusing Counterclaimants of committing arson. This statement is unquestionably "loose, figurative, or hyperbolic language that cannot reasonably be interpreted as stating or implying facts susceptible of being proved true or false" and is therefore not actionable. *Takieh*, 497 P.3d at 1006 (cleaned up).

m. **"Cunt Face Brenda"**

Kahle's reference to Bryant as "Cunt face Brenda" (Doc. 47-2 at 78) cannot reasonably be interpreted as anything other than non-actionable "harsh name-calling." *Flowers*, 310 F.3d at 1127. There is no indication in the cited text exchange, nor anywhere else in the record, that Kahle was using the term "cunt face" to imply an assertion of fact that Bryant has a face with female genital organs on it or to imply an assertion of fact that Bryant is a prostitute or adulterer. *See, e.g.*, *Cox*, 2024 WL 98162 at *6.

n. **"Your Whore Adopted Mom"**

Counterclaimants argue that Kahle referred to Bryant as Helms's "adopted mom." (Doc. 55 at 5.) Counterclaimants also argue that "Bryant never told Helms 'he was like [her] son' and did not bail him out of jail." (*Id.*)

As an initial matter, the statement that Bryant bailed Helms out of jail was made by Helms, not Kahle, and therefore cannot supply the basis for Counterclaimants' defamation claim against Kahle. (Doc. 47-2 at 82.) Nevertheless, Kahle did refer to Bryant as "your [i.e., Helms's] whore adopted 'mom.'" (*Id.* at 80.) But yet again, the use of the word "whore" in this context is not intended as an objectively verifiable statement of fact that Bryant has sex for money; rather, it is non-actionable "harsh name-calling." *Flowers*, 310

F.3d at 1127.

To the extent Counterclaimants' argument is that Kahle's statement referring to Bryant as Helms's "adopted mom" should be taken literally—i.e., that Kahle was making an objectively verifiable statement of fact that Bryant has adopted Helms as her son—that argument is without merit. Once again, Kahle's statement was "loose, figurative, [and] hyperbolic," *Takieh*, 497 P.3d at 1006 (citation omitted), and no reasonable juror would read this statement literally. And to the extent Counterclaimants' argument is that Kahle's statement implied a false fact that Bryant treats Helms "like her son," that too would not be objectively verifiable, nor would it bring Counterclaimants into disrepute. It is merely Kahle's opinion that Bryant was treating Helms like a son.

**o. "[Bryant]'s Got A Bag"**

Kahle's full text message reads: "[Bryant]'s got a bag *what the fuck does that mean*." (Doc. 47-2 at 86, emphasis added.) This is a clear reference to an earlier text message from Helms to Kahle that reads: "[Bryant]'s got a punching bag you know, you should get one too it's good for keeping your spine healthy." (*Id.* at 82.) Kahle's text message seems to be a question, not an objectively verifiable statement of fact, and even if it could be construed as an objectively verifiable statement of fact that Bryant owns a punching bag, that is not a statement that would bring Counterclaimants "into disrepute, contempt, or ridicule, or . . . impeach [their] honesty, integrity, virtue, or reputation." *Harris*, 527 P.3d at 320 (cleaned up).

**p. "You're Working For Unethical Entitled Hateful Monsters"**

Whether a person is an "unethical entitled hateful monster[]" is not something that can be objectively verified. *See, e.g.*, *Collins v. Wal-Mart Stores, Inc.*, 2026 WL 232364, *3 (S.D. Cal. 2026) ("Even the more extreme statements—allegedly about Plaintiff being a loser, monster, or not even a good person—are at most 'rhetorical hyperbole' or 'vigorous epithets,' which are not actionable under a defamation claim.") (citation omitted); *Dodge v. Evergreen Sch. Dist. No. 114*, 2020 WL 4366054, *6 (W.D. Wash. 2020) ("Defendants

argue . . . that Garrett's alleged statements are nothing more than statements of opinion. The Court agrees. . . . [W]hether someone is racist, bigoted, and hateful in general is not a factual question."); *Prostrollo*, 2018 WL 501414 at *6 (referring to someone as "unethical" is not defamatory because what it means to be "unethical" "is incapable of being objectively proven because there is no identifiable standard from which a fact finder can assess such behavior"). Accordingly, this statement is not defamatory.

q. **"They're Very Good At Manipulating Misfits"**

Kahle's alleged statement that Counterclaimants are "good at manipulating misfits" is not defamatory. What it means to be "good at manipulating" someone, and moreover, what constitutes a "misfit," is subjective. *See, e.g.*, *Life Mastery Network LLC v. Haygarth*, 2026 WL 1622887, *20 (D. Haw. 2026) ("[B]eing called 'manipulative and dishonest' is an opinion statement that . . . is further unable to be proven true or false"); *Marom v. Pierot*, 2020 WL 1862974, *8 (S.D.N.Y. 2020), *report and recommendation adopted*, 2020 WL 1444938 (S.D.N.Y. 2020) ("[A] reasonable listener would hear the statement 'he is vicious and manipulative,' as 'loose, figurative, or hyperbolic' and not actionable for defamation. While 'vicious' and 'manipulative,' might be incendiary, they could not be heard by 'even the most careless listener' as more than 'vigorous epithets.'") (cleaned up); *Nicosia v. De Rooy*, 72 F. Supp. 2d 1093, 1106 (N.D. Cal. 1999) (referring to someone as a "Manipulative Svengali" not actionable as defamation because "[m]anipulation . . . refers to subjective motivations and personality traits, which are not provable as true or false").

r. **"Stepped To [Kahle]" /"Challenged [Kahle] To A Physical Fight" / "Physically Threatening"**

Counterclaimants argue that "Kahle stated Bryant 'stepped to [her]' and 'challenged [her] to a physical fight'" and that Kahle claimed Bryant was "physical threatening." (Doc. 55 at 6.) Although Kahle does not specifically identify these statements as among Counterclaimants' "new alleged statements raised for the first time in opposition to summary judgment" (Doc. 64 at 7), these statements do not appear in the counterclaims (Doc. 4 at 12-20), nor do they appear in Counterclaimants' response or amended response

to Interrogatory No. 3 (Doc. 47-2 at 32-34, 38-43). For the reasons explained above, Counterclaimants may not raise these new allegedly defamatory statements for the first time in response to a summary judgment motion.

**C. Declaratory Judgment**

1. The Parties' Arguments

Kahle argues that "[t]he Answer and Counterclaims list declaratory relief as Counterclaimants' third independent cause of action" but "[c]ourts have held that declaratory relief 'are remedies, not independent causes of action.'" (Doc. 47 at 15, citation omitted.)

In response, Counterclaimants argue that "[p]ursuant to the Declaratory Judgment Act ('DJA'), Counterclaimants seek a declaration that Kahle's above-referenced statements 'were and are false'" and that the "DJA authorizes the Court to 'declare the rights and other legal relations of any party seeking such declaration.'" (Doc. 55 at 16, citations omitted.) Counterclaimants acknowledge that the DJA "does not provide an affirmative cause of action where none otherwise exists," but they argue that "Counterclaimants seek only declaratory relief related to their underlying defamation and false light claims" and "Kahle fails to show they are precluded from seeking such relief." (*Id.*, citation omitted.)

Kahle does not address Counterclaimants' claim for declaratory relief in her reply. (Doc. 64.)

2. Analysis

To the extent Count Three (Declaratory Relief) can be viewed as a separate cause of action, the Court will grant Kahle's motion for summary judgment. Count Three of the counterclaims seeks a declaration that the various statements underlying Counterclaimants' claims for defamation and false light are false. But a claim for declaratory relief is "not a proper cause of action, at least where, as here, it simply seeks a declaration concerning some of the merits issues being raised in other causes of action." *Dickman v. New York Life Ins. Co.*, 2025 WL 3033640, *12 (D. Ariz. 2025) (citation omitted).

D. **Attorneys' Fees**

1. The Parties' Arguments

Kahle argues that she is entitled to attorneys' fees under A.R.S. § 12-349 because "Counterclaimants' claims here are groundless" and not "coherent." (Doc. 47 at 15.) Kahle also argues that "the counterclaims were brought in bad faith." (*Id.* at 16.) Among other things, Kahle argues that "Counterclaimants brought counterclaims to punish and retaliate against Ms. Kahle for rightfully pursuing legal action" in violation of Title VII and the National Labor Relations Act ("NLRA"). (*Id.* at 16-17.)

In response, Counterclaimants argue that "Kahle is not entitled to her attorney's fees because such an award is not authorized by contract nor statute" and "her Answer does not indicate she is seeking such an award." (Doc. 55 at 16.) Counterclaimants also argue that Kahle "may not seek fees under A.R.S. § 12-349 because the Court 'applies the policies and procedures delineated under federal law' when awarding attorney's fees as sanctions." (*Id.*, citation omitted.) Next, Counterclaimants argue that "[e]ven if Arizona law somehow applies, Kahle is not entitled to fees because the counterclaims are not 'groundless' and were 'made in good faith.'" (*Id.*, citation omitted.) Last, Counterclaimants argue that "Kahle is not entitled to attorney's fees by retroactively manufacturing claims under Title VII and/or the NLRA based upon what she now contends were retaliatory counterclaims" because "Kahle never pled such claims in this action." (*Id.* at 17.)

In reply, Kahle does not address Counterclaimants' arguments and simply asks the Court to "grant [her] motion and enter judgment in [her] favor with an assessment of reasonable attorneys' fees." (Doc. 64 at 8.)

2. Analysis

Kahle's request for attorneys' fees "is facially deficient" because "the statute on which [her] request is based, A.R.S. § 12-349, is inapplicable in federal court." *Offerpad Inc. v. Saenz*, 2021 WL 5634870, *4 (D. Ariz. 2021). *See also In re Larry's Apartment, L.L.C.*, 249 F.3d 832, 838-39 (9th Cir. 2001) (reversing fee award imposed under § 12-349, "question[ing] . . . the propriety of using an Arizona sanction statute in an action in

federal court," and concluding that "when fees are based upon misconduct by an attorney or party in the litigation itself, rather than upon a matter of substantive law, the matter is procedural [under *Erie*]. . . . In other words, the federal courts must be in control of their own proceedings and of the parties before them, and it is almost apodictic that federal sanction law is the body of law to be considered in that regard."); *Pacesetter Consulting LLC v. Kapreilian*, 2021 WL 4820485, *4 (D. Ariz. 2021) ("[T]he Ninth Circuit has held that § 12-349 cannot serve as the basis for an award of sanctions by a federal court for litigation conduct occurring in federal court."). Accordingly, Kahle's request for attorneys' fees under A.R.S. § 12-349 is denied.

Accordingly,

**IT IS ORDERED** that each side's motion for summary judgment (Docs. 46, 47) is **granted in part and denied in part**.

Dated this 27th day of August, 2026.

Dominic W. Lanza
United States District Judge